UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
FABRIZIO PIGNOLONI,

            Petitioner,

   -against-                                    **MEMORANDUM AND ORDER**

LUISE ANN GALLAGHER,                           12-CV-3305 (KAM)(MDG)

            Respondent.

------------------------------------X

**MATSUMOTO, United States District Judge:**

            On July 3, 2012, Petitioner Fabrizio Pignoloni

("Petitioner") filed a petition under the Hague Convention on

the Civil Aspects of International Child Abduction (the "Hague

Convention" or the "Convention") as implemented in the United

States by the International Child Abduction Remedies Act

("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, seeking an order

directing Respondent Luise Ann Gallagher ("Respondent") to

return their two minor sons, E.G.P. and A.T.P. (the "children"),[1]

to Italy.  Petitioner contends that Respondent wrongfully

removed the children from Italy on April 24, 2012 and retained

them in the United States in violation of his custody rights

under Italian law.  In response, Respondent maintains that her

removal and retention of the children were authorized by a

---
[1] To protect the children's identities, their initials will be
used instead of their names pursuant to Fed. R. Civ. P. 5.2. *See Radu v.
Toader*, 805 F. Supp. 2d 1, 3 n.1 (E.D.N.Y. 2011), *aff'd*, 463 F. App'x 29 (2d
Cir. 2012) (summary order).

consensual separation agreement signed by Petitioner and
ratified by an Italian court.

The court conducted a three-day bench trial on August
23, 24, and 27 and permitted the parties to submit post-trial
submissions, which were completed on September 24, 2012. For
the reasons set forth below, the court finds that the consensual
separation agreement authorized Respondent to return to the
United States with the children and therefore denies
Petitioner's application for relief under the Hague Convention.

<u>**BACKGROUND**</u>

I.    <u>**Findings of Fact**</u>[2]

    A.    **Petitioner and Respondent's Marriage, the Family's**
          **Relocation to Italy, and the Birth of the Children**

In December 2003, Petitioner, an Italian citizen, met
Respondent, a United States citizen, in New York. (*See* Tr.
26:11-14.) During that time, Respondent worked full-time at
Polo Ralph Lauren ("Polo") as a technical designer,[3] (Tr. 29:23-
30:6, 262:11-21), and Petitioner managed Soho IT Services, an
information technology company that he has owned for over twenty

_____

        [2] Unless otherwise indicated, the following facts have been
established by a preponderance of the evidence and are based upon evidence
admitted at trial and the parties' credible testimony contained in the
parties' affidavits or the trial transcript ("Tr.").
        [3] Respondent is also the owner and sole shareholder of Spec Tech
Direct, Inc. ("Spec Tech Direct"), a New York corporation established before
2000. (Tr. 273:21-24; 311:18-22; 313:7-8.) Based on exhibits in the record,
Respondent appears to have provided some of her services to Polo and other
companies through Spec Tech Direct. (*See, e.g.*, Pet. Exh. 37, at 13-25; Pet.
Exh. 38, at 1.)

years, as of the date of the hearing in this action. (Tr. 28:10-14.)

On June 24, 2005, Petitioner married Respondent in New York, and shortly thereafter, returned to Italy. (Tr. 26:15-27:5.)  At the time of their marriage, Respondent worked at Polo and continued to work there until the end of 2005.[4] (Tr. 30:7-13; 262:15-21.)  On November 28, 2005, Petitioner's and Respondent's first son, E.G.P., was born in New York. (Tr. 27:15-20.) Petitioner briefly returned to New York to attend E.G.P.'s birth. (Tr. 27:1-5.)

In January 2006, Respondent and E.G.P. relocated to Italy, where they initially resided with Petitioner in his mother's house in Ascoli Piceno, Italy for approximately three months. (Tr. 26:23-25, 267:1-6.)  Thereafter, Petitioner, Respondent, and E.G.P. moved into an apartment at Via Minucia, Ascoli Piceno (the "Via Minucia apartment").[5] (Tr. 267:1-6.) During this time, Respondent expected to be a stay-at-home mother because she was adjusting to a new country, did not speak Italian fluently, and believed that Petitioner's company was stable enough to support the family. (Tr. 265:6-266:25.)

---

[4] Respondent earned approximately $80,000 working for Polo in 2005. (Tr. 263:4-11; Resp. Exh. A, at 1.)
[5] The record indicates that Petitioner lived in the Via Minucia apartment since January 2005, prior to the arrival of Respondent and E.G.P. to Italy. (Tr. 86:22-23.)

Despite this expectation, Respondent returned to work in or around late 2006 or early 2007 and thereafter completed various part-time projects for Polo in New York, requiring her to leave Italy for weeks or months at a time. (*See* Tr. 29:11-22, 269:8-270:1.)

Respondent continued this intermittent employment arrangement completing projects with Polo until early 2008 when she became pregnant with Petitioner's second son, A.T.P. (*See* Tr. 27:21-24, 28:20-23, 30:14-18.)  During Respondent's pregnancy with A.T.P., Petitioner was the only person working in the household and served as the sole provider for the family. (Tr. 30:14-18, 31:25-32:2.)  A.T.P. was born on September 18, 2008 in Ancona, Italy, and Respondent resumed her part-time work for Polo in New York a few months later. (Tr. 27:21-24, 28:23-29:2.)

Since their births, the children have interacted nearly every day with Petitioner's large extended family, including Petitioner's mother, his siblings, and his siblings' children, all of whom live in Ascoli Piceno, Italy. (*See* Tr. 45:7-24.)  Additionally, both children have attended school in Italy and speak Italian as their primary language. (*See* Tr. 63:15-16, 104:10-15.)  A.T.P. does not speak any English, and E.G.P. speaks very limited English. (Tr. 63:15-16.)  The

4

children, however, have traveled to the United States every year during the Christmas holiday. (ECF No. 1, Affidavit of Petitioner ("Pignoloni Decl.") ¶ 6.) The children are dual citizens of Italy and the United States and possess passports from both countries. (Tr. 63:3-10.)

**B. Respondent's Attempted Departure in May 2009**

After the birth of A.T.P., Petitioner and Respondent experienced marital discord. (Pignoloni Decl. ¶ 9.) In May 2009, Respondent purchased three airplane tickets to the United States and attempted to leave Italy with the children without Petitioner's knowledge. (*See* Tr. 62:6-15.) After discovering the absence of Respondent and the children, Petitioner notified the Italian police and also filed a complaint with the Court of Minor Children, which suspended the validity of the children's passports and prohibited the children from leaving Italy absent authorization from both parents. (Tr. 62:16-24, 151:13-25.) Upon notification that Petitioner contacted the Italian authorities, Respondent voluntarily returned to Ascoli Piceno with the children and expressed her intent to attempt to resolve the marital problems with Petitioner. (*See* Tr. 151:13-25; Pignoloni Decl. ¶ 12.)

## C. The September 2010 and April 2011 Separation Agreements[6]

During the summer of 2010, Respondent traveled to New York for a few months to work. (Pignoloni Decl. ¶ 13.) Specifically, between June and August 2010, Respondent worked in New York for about two or three months without interruption. (Tr.39:5-15.) Upon Respondent's return to Italy, the marital problems reemerged, resulting in the parties' consensual separation. (*See* Pignoloni Decl. ¶ 13-14; Tr. 32:19-23.) In September 2010, Petitioner and Respondent formally entered into a separation agreement (the "September 2010 Separation Agreement"), which was ratified by an Italian court. (Tr. 32:19-33:12; Pet. Exh. 8, at 11-20.) Both parties were represented by counsel when they negotiated the terms of and entered into the September 2010 Separation Agreement; specifically, Petitioner was represented by Attorney Carlo Grilli, and Respondent was represented by Attorney Patricia Pasqualini. (Tr. 37:22-38:9.)

---

[6] Petitioner and Respondent both submitted their own English translations of certain provisions contained in the parties' Italian Separation Agreements. Because those respective translations differed in material ways, the court ordered the translation of the Separation Agreements by a court-appointed Italian language interpreter, Ms. Luciana Ames. Ms. Ames, a native Italian speaker, is an expert in Italian-to-English and English-to-Italian translation, and her curriculum vitae indicates that she is fluent in Italian and English, has served as an instructor in Italian language at Columbia College and Fordham University, and has testified in Hague Convention cases before the United States District Court for the Southern District of New York. (Court Exh. 1; *see* Tr. 356:17-24.) The parties have consented to Ms. Ames' translation of the September 2010 Separation Agreement (Pet. Exh. 8) and April 2011 Separation Agreement (Resp. Exh. T) for the purposes of this action.

6

In accordance with the September 2010 Separation Agreement, Petitioner moved out of the Via Minucia apartment immediately after the separation. (Tr. 32:24-25; *see* Pet. Exh. 8, at 14.) During this time, Respondent stopped working in order to stay home with A.T.P., who was diagnosed with muscular dystrophy, and did not return to work until approximately May 2011.[7] (Tr. 49:5-15.) Petitioner, however, continued working to support the family and to pay Respondent the monthly child and spousal support obligations required under the September 2010 Separation Agreement. (*See* Tr. 49:5-20, 65:9-13; Pet. Exh. 8, at 15.) Specifically, the September 2010 Separation Agreement required Petitioner to pay Respondent € 500 per month in spousal support and € 400 in child support for their two children. (Pet. Exh. 8, at 15.)

On April 29, 2011, Petitioner and Respondent signed a supplemental separation agreement (the "April 2011 Separation Agreement") that was subsequently integrated into the September 2010 Separation Agreement. (Tr. 49:21-24; Resp. Exh. T.) In connection with the April 2011 Separation Agreement, Petitioner

---

[7] Petitioner testified that during the six months immediately preceding the September 2010 Separation Agreement, he paid all of the utilities, car payments, medical expenses, and "everything" else. (Tr.38:19-39:4.) Respondent, however, credibly testified that she was not aware of the financial status and difficulties suffered by the family during that time because Petitioner did not share any of his financial information. (Tr. 270:5-24.)

and Respondent were represented by Attorneys Grilli and Pasqualini, respectively. (Tr. 56:13-20.) Moreover, Petitioner testified that he reviewed the April 2011 Separation Agreement with Attorney Grilli and understood what he was signing. (Tr. 56:13-18.) On May 25, 2011, the Italian court ratified the April 2011 Separation Agreement, and the presiding judge so ordered the agreement. (*See* Tr. 33:8-34:1; Resp. Exh. T, at 8.) The April 2011 Separation Agreement contains numerous provisions related to Petitioner's support obligations, Respondent's rights to travel for work, the parties' rights to travel with the children, and the parties' respective custody rights, all of which are relevant to the Hague Convention petition now before the court.

For example, Paragraph C of the April 2011 Separation Agreement sets forth the joint custody rights of Petitioner and Respondent and specifies that the children will live with Respondent in the Via Minucia apartment. (*See* Resp. Exh. T, at 2.) Paragraph C further states that the "mother, at the end of the children's school commitments, will also be able to spend one month in the company of the children in Italy or in any other place outside Italy, either in Europe as well as in the United States or in any other part of the world, as long as it has previously been agreed on with the husband." (*Id.*)

8

With respect to Petitioner's child support obligations, Paragraph D of the April 2011 Separation Agreement states that "Mr. Pignoloni will take exclusively upon himself the obligation of child support paying to the wife € 200/00 (two hundred/00 euros) . . . for each son to be deposited, within the first five days of every month, in the bank checking account in the name of Mrs. Gallagher." (Resp. Exh. T, at 2-3; Tr. 64:7-9, 14-20.) With respect to Petitioner's spousal support obligations, Paragraph E of the April 2011 Separation Agreement reflected a reduction of € 400 per month in spousal support from the September 2010 Separation Agreement as follows: "Fabrizio Pignoloni binds himself to pay to the wife spousal support of a monthly amount of € 100/00 (one hundred/00 euros) . . . within the first five days of every month by means of a credit transfer to the bank checking account in the name of Mrs. Gallagher." (Resp. Exh. T, at 3; Tr. 64:7-8; 278:22-279:7.)

Additionally, Paragraph F of the April 2011 Separation Agreement sets forth Petitioner's obligation to pay the rent on the Via Minucia apartment and provides that "Fabrizio Pignoloni binds himself to pay the rent of the apartment in Via Minucia, equal as of today to € 456/00 monthly . . . by making payment directly to the owners." (Resp. Exh. T, at 3.) Paragraph F further stipulates that "[i]n the case of relocation agreed on

between the spouses of Mrs. Gallagher and the children to a different lodging, he binds himself to pay the new rent up to € 600/00 monthly." (*Id.*)

Paragraph L delineates Respondent's right to travel to New York for work reasons and states that Petitioner "authorizes temporary transfers of his wife to New York or to the United States generally for work reasons and for certain periods of time limited to the execution of the work itself . . . [and] authorizes the wife's departure from the home for a few days to sit for job interviews." (Resp. Exh. T, at 4; Tr. 56:21-57:14.)

Finally, Paragraph O, a new provision added to the April 2011 Separation Agreement at the request of Respondent, provides that

> [i]n case of non-payment of several monthly rent installments by Mr. Pignoloni resulting in lawsuits on behalf of the owners / or of non-bank-deposit for at least four months of the support for the children and for the wife and should the wife be unable, not having any type of income of her own, to support and maintain the children and herself, Mr. Pignoloni is willing to authorize the wife to return with the children to the United States to her family's home provided that the wife proves that she has found a job of her own.

(Resp. Exh. T, at 5; Tr. 130:7-10, 279:23-25.) Petitioner testified that he and his attorney had no objection to the addition of Paragraph O because he believed that Paragraph O was

essentially meaningless and did not change anything with respect
to his rights even though Respondent accepted a lower support
payment in exchange for including Paragraph O in the April 2011
Separation Agreement. (Tr. 130:2-131:2.)  Respondent, on the
other hand, who was to receive € 400 less per month in spousal
support under the April 2011 Separation Agreement, believed that
Paragraph O was an important "safety net" that permitted her to
return to the United States with the children in the event that
Petitioner failed to comply with his support obligations under
the separation agreement. (Tr. 279:14-280:11.)

### D.   Petitioner's Failure to Satisfy His Child and Spousal Support Obligations Under the Separation Agreements

Between September 2010 and April 2011, Petitioner made
the required monthly child and spousal support payments in the
amount of € 900 as required by the September 2010 Separation
Agreement. (*See* Tr. 278:9-12.)  Ordinarily, Petitioner made
support payments to Respondent through bank transfers as
required under the September 2010 and April 2011 Separation
Agreements, but would sometimes pay Respondent by check. (Tr.
65:14-19.)  Respondent credibly testified that she depended
heavily upon Petitioner's child and spousal support payments to
survive after their separation in September 2010 because she had

very little savings and only periodic freelance work. (Tr. 270:25-271:15, 272:16-21.)

As set forth above, the April 2011 Separation Agreement modified the amount of spousal support that Petitioner owed to Respondent, lowering Petitioner's monthly spousal support obligations from € 500 per month to € 100 per month, but required Petitioner to continue paying € 400 per month in child support for the two children. (*See* Tr. 278:22-279:7; Pet. Exh. 8, at 15; Resp. Exh. T, at 2-3.) Between April 2011 and September 2011, Petitioner paid Respondent the adjusted spousal and child support obligations, in the total amount of € 500 per month, as set forth in the April 2011 Separation Agreement. (Tr. 281:22-24.) Additionally, during this period, between May and June 2011, Respondent worked for Polo for approximately one month in Italy, during which she was paid an hourly rate of $80 per hour and an overtime rate of $120 per hour. (Tr. 282:25-283:2, 325:6-326:7; *see* Pet. Exh. 37, 3-11.)

Petitioner, however, conceded that between September 2011 and April 2012, he failed to deposit the required monthly payments of € 500 into Respondent's bank account within the first five days of each calendar month, as required by the April

2011 Separation Agreement.[8] (Tr. 68:8-12, 161:7-16.)

Specifically, the evidence in the record reveals the following

deficiencies in Petitioner's total spousal and child support

obligations in the amount of € 500 per month between the months

of September 2011 and April 2012:

- September 2011: Petitioner failed to pay € 50.
- October 2011: Petitioner failed to pay € 300.
- November 2011: Petitioner failed to pay € 400.[9]
- December 2011: Petitioner failed to pay € 500.
- January 2012: Petitioner failed to pay € 500.

---

[8] Petitioner testified that between September 2011 and March 2012, he made support payments by paying for food and other expenses, which were usually Respondent's responsibility, because Respondent was sometimes away from home to work on part-time projects for Polo or other companies. (Tr. 65:17-19, 68:17-24.) Petitioner believed that he could deduct the amounts he paid for such expenses from the € 500 support payments required under the April 2011 Separation Agreement. (*See* Tr. 69:15-22.) Petitioner, however, has provided little evidentiary support for these purported payments, cannot point to a provision in either of the Separation Agreements that permits him to make partial support payments by paying for food expenses, and concedes that an Italian court has never approved the arrangement whereby Petitioner would pay for any expenses in lieu of depositing the required support payments into Respondent's account. (*See* Tr. 69:23-25.) To the contrary, Paragraphs D and E of the court-ratified April 2011 Separation Agreement indicate that Petitioner was obligated to pay child and spousal support to Respondent by transferring the required amounts into her personal bank account. (*See* Resp. Exh. T, at 2-3.) The agreement provides no authorization for alternative methods of payment. Furthermore, according to Petitioner's Italian law expert, Petitioner would have to file a petition with an Italian court and receive the court's approval to modify the terms of the court-approved Separation Agreements. (Tr. 242:5-243:25.) Petitioner did not do so here.

[9] Petitioner testified that, in November 2011, Respondent requested $200 from Petitioner to allow her to buy a train ticket and food while she was traveling for work away from home. (Tr. 80:2-17; Pet. Exh. 33, at 6.) Petitioner, however, did not submit proof or testimony that Respondent actually received the requested $200, and instead only asserted that Respondent requested money from him "very often" and that he would transfer money to Respondent "depend[ing] upon her request." (*See* Tr. 80:2-17.) Even assuming that Petitioner transferred $200 to Respondent and that the $200 constituted partial payment of Petitioner's required support obligations for November 2011, Petitioner still would not have satisfied his monthly spousal and child support obligations under the April 2011 Separation Agreement.

13

- <u>February 2012</u>: Petitioner failed to pay € 250.
- <u>March 2012</u>: Petitioner failed to pay € 350.[10]
- <u>April 2012</u>: Petitioner failed to pay € 200.

(Pet. Exh. 26, at 1-4 (the complete record of bank deposits made by Petitioner to Respondent for child and spousal support between September 2011 and April 2012); Tr. 162:13-24.) Although Respondent did not commence any formal legal proceedings against Petitioner for his repeated failure to satisfy his support obligations, Respondent, through her attorney, sent Petitioner letters objecting to his deficient support payments. (Tr. 147:6-150:15.)

During the period of Petitioner's delinquency in providing support payments, Respondent worked as a freelance designer for Polo at various times in order to support herself and her children. Additionally, Petitioner testified that he was aware of Respondent's work during this time because she would leave the Via Minucia apartment to travel for work, requiring Petitioner to care for the children. (Tr. 86:2-9.) Specifically, the record includes Respondent's Polo timesheets for the months of May and June 2011, itemizing Respondent's billed hours for those months. (Pet. Exh. 37, at 4-12.)

---

[10] Petitioner submitted a handwritten receipt of his March 30, 2012 cash payment of € 150 to Respondent and testified that Respondent signed the receipt. (Pet. Exh. 26, at 5; Tr. 70:5-12.) Petitioner testified that he could not recall writing any other checks to Respondent between September 2011 and April 2012 and that he had no bank copies of any such checks. (Tr. 163:6-23.)

Further, in September 2011, Respondent traveled to Milan to work in a Polo factory for a few months, which required her to travel six hours away from home. (Tr. 283:25-284:5, 358:22-359:15; Pet. Exh. 37, at 13-19.)  At this time, Respondent traveled back and forth between Ascoli Piceno and Milan, staying in Milan for days at a time. (Tr. 359:21-360:3.)  Respondent took on a final project with Polo in Milan around March 25, 2012. (Tr. 382:5-16; Pet. Exh. 33, at 15.)

After separating from Petitioner in September 2010, Respondent routinely resorted to the use of credit cards to pay for necessary expenses for herself and the children but was often unable to pay the monthly bills for those credit cards. (Tr. 276:9-277:3.)  Consequently, Respondent incurred a significant amount of debt due in part to her attempts to provide for herself and her children in the absence of the Petitioner's full spousal and child support payments required under the Separation Agreements and ordered by the Italian court. (*See* Tr. 276:9-277:3, 289:22-24.)

### E.   Petitioner's Failure to Fulfill His Rent Obligations Under the Separation Agreements

Petitioner testified that although he had moved out of the Via Minucia apartment after the September 2010 Separation Agreement, he made several repairs to the Via Minucia apartment

to eliminate humidity and mold, problems which started in 2008 and continued up until February 2012, because the owners of the apartment took no action to resolve them. (Tr. 87:6-24, 90:10-21.) Despite making these repairs, however, Petitioner routinely failed to pay rent for the Via Minucia apartment where Respondent and the children resided, resulting in the commencement of an eviction proceeding.[11] (Tr. 158:4-10; Resp. Exh. G, at 3.) Specifically, on January 10, 2012, the owners of the Via Minucia apartment, through counsel, filed an eviction complaint in Italian court alleging breach of the rental lease[12] and seeking payment of the following rental arrears: € 437.31 in 2006; € 99.08 in 2007; € 233.00 in 2008; € 820.35 in 2009; € 1,894.14 in 2010; and € 5,180.78 for the months of January through November 2011. (Resp. Exh. G, at 2-4.) Moreover, the

---

[11] Respondent testified that she learned of the eviction proceeding in February or March 2012 when the owners of the Via Minucia apartment sent her a certified copy of the eviction complaint. (Tr. 268:7-14, 409:3-7.)

[12] The Lease for the Via Minucia apartment states, in relevant part:

> [T]he payment of the rent fee and of whatever else is due including additional charges may not be suspended or delayed by the Lessee with claims or exceptions, whatever the reason may be, the non-punctual payment of the rent installment and whatever additional charges are due when the total amount is in the amount of two monthly rent payments is a serious breach of this contract and reason for legal cancellation of the contract.

(Pet. Exh. 44, at 4.) The Lease contains no alternative forms of paying rent by, for example, making repairs on the apartment and deducting repair costs from the monthly rent. (*See* Pet. Exh. 44, at 2.)

owners of the Via Minucia apartment also claimed that Petitioner
failed to pay various condominium fees and registration
penalties, resulting in a total arrearage sum of € 9,147.42 as
of December 15, 2011. (Resp. Exh. G, at 3.)  Notwithstanding the
commencement of eviction proceedings in January 2012, Respondent
and the children were not evicted from the Via Minucia apartment
because Petitioner's attorneys challenged the eviction action
and the Italian judge ultimately determined that the parties
were required to reach a mutual agreement regarding the rental
arrears. (*See* Tr. 158:12-159:15.)  Notably, Respondent credibly
testified that between September 2011 and April 2012, she would
have been unable to pay for her living expenses, childcare
expenses, and the rent. (Tr. 289:5-21.)

**F.    Respondent's March 2012 Relocation from the Via
       Minucia Apartment**

On February 28, 2012, Petitioner signed a new lease
for a different residence in Ascoli Piceno. (Tr. 98:4-5.)
During the last week of March 2012, Respondent and the children
moved out of the Via Minucia apartment and into the new
residence. (Tr. 97:16-98:1.)  Petitioner testified that he paid
rent in advance for the new apartment for the months of April,
May, and June 2012. (Tr. 99:5-9.)

### G. Respondent's Departure from Italy in April 2012

At trial, Petitioner and Respondent advanced seemingly contradictory testimony regarding whether Respondent notified Petitioner and obtained his express consent to travel to New York with the children prior to her departure in April 2012. On one hand, Petitioner testified that Respondent left Italy with the children without giving him any notice and without obtaining his consent regarding her plan to travel with the children to the United States in April 2012. (Tr. 104:23-25, 500:23-501:5.) On the other hand, Respondent testified that she notified Petitioner verbally on numerous occasions a month to six weeks before she left for the United States that she and the children planned to travel to the United States for her godson's party and that Petitioner had no objection to her leaving with the children. (Tr. 294:16-25, 422:20-25.) Respondent further testified that she received the Petitioner's consent before traveling to New York and that Petitioner told her to "go ahead" after Respondent asked him numerous times. (Tr. 451:11-16, 452:8-25, 453:7-24.) Respondent also testified that on April 23, 2012, Petitioner met Respondent for about twenty minutes at a public pool close to Petitioner's office where E.G.P. was participating in a swimming lesson; according to Respondent, Petitioner stopped by the public pool to say goodbye to the

children before they left to the United States the next day. (Tr. 295:2-13; 413:11-23.) Although the court finds resolution of this factual dispute unnecessary to determine the issues presently before the court, the court finds Respondent's testimony to be credible based upon her demeanor and testimony that appeared consistent with the documents in evidence.

Petitioner testified that, on April 23, 2012, he sent Respondent a text message telling her about an appointment with a psychologist at Santo Stefano Rehabilitation Center ("Santo Stefano") regarding A.T.P.'s treatment, scheduled for the following morning. (Tr. 102:18-103:3; Pet. Exh. 48, at 2.) Respondent testified that she did not know of or schedule the appointment and did not recall receiving this reminder. (Tr. 458:3-20.) The record indicates that Respondent sent text messages in reply to Petitioner expressing that she was not called about the appointment and that she "[could not] attend without Alessandra," her interpreter, being present for A.T.P.'s appointment. (Pet. Exh. 48, at 2; Tr. 457:5-24.) Respondent further testified that it was possible that she forgot about A.T.P.'s appointment because she was busy juggling her work, travel, and childcare responsibilities. (Tr. 459:10-20.)

On April 24, 2012, Respondent departed from Italy with

the children and traveled to New York.[13] (Tr. 102:11-15.) Prior
to her departure, Respondent did not provide Petitioner with any
contact information for herself or the children because
Petitioner had all of Respondent's contact information for
Respondent's family in the United States. (Tr. 108:14-21,
414:20-24.) Upon arrival in the United States, Respondent and
her children initially stayed with her mother, who picked them
up from the airport and had recently moved to a new address
outside of New York without previously informing Respondent of
the new address. (Tr. 414:25-415:2.)

On the day of Respondent's departure, Petitioner
arrived at Santo Stefano at 11:00 am for A.T.P.'s psychologist
appointment and attempted to call Respondent after she did not
appear. (Tr. 102:18-103:6.) Unable to reach Respondent by
phone, Petitioner eventually attended the appointment by himself
believing that Respondent was still at home sleeping, despite
Respondent's earlier text informing him that she could not
attend the appointment without her interpreter. (Tr. 102:18-
103:6, Pet. Exh. 48, at 2.) Because April 24th was a school

---

[13] On April 24th, Respondent was not working on any projects for
Polo or other companies. (*See* Tr. 385:19-24.) At some point after her
departure, however, Respondent was offered an interview to work in the
Bologna office of Polo but was unable to interview for the position because,
by that time, she was already in New York, the scheduling was difficult, and
she was concerned about returning to Italy in light of Petitioner's complaint
to the Italian police. (Tr. 284:3-13, 484:5-485:3; Resp. Exh. Y, at 1.)

day, (Tr. 104:16-20), Petitioner went to A.T.P.'s school at 2:00 pm intending to pick him up but discovered that A.T.P. was not at school. (Tr. 103:7-9.) Petitioner then went to E.G.P.'s school and learned that E.G.P. was also absent from school that day. (Tr. 103:23-104:1.) Concerned about his children's absence from school, Petitioner called all of Respondent's acquaintances in Italy, who knew nothing about the children's whereabouts. (Tr.104:3-6.) Petitioner also checked Respondent's apartment but found her car missing and all of her apartment windows ajar. (Tr. 104:5-8.) Finally, Petitioner then called his Italian attorney, and together they went to the Ascoli Piceno police office. (Tr. 105:5-9.)

On the following day, a police officer called Petitioner to inform him that Respondent flew to the United States with the children and that she had a return flight scheduled for May 25, 2012. (Tr. 105:11-15.) The police officer further advised Petitioner not to take any immediate action and recommended that Petitioner speak directly with Respondent. (Tr. 105:19-21.) Heeding that advice, Petitioner attempted to contact Respondent by calling her mother's old phone number, which was disconnected after the mother's relocation, and thereafter tried calling Respondent's Italian cell phone, which was not operable in the United States at that time. (*See* Tr.

501:14-18, 502:8-13.) Respondent did not make contact with
Petitioner between April 24 and April 30, 2012. (Tr. 501:6-9.)
After the first four days of her arrival in the United States,
Respondent called Petitioner once or twice a week so the
children could be in contact with their father, and if she could
not reach Petitioner, she would call Petitioner's mother. (Tr.
423:8-12.)

On approximately April 30, 2012, Respondent called
Petitioner's mother and informed her that she was in the United
States with the children "for family reasons" and that she would
return to Italy on May 25, 2012. (Tr. 105:22-106:3.) On April
30, 2012, Respondent also e-mailed Petitioner explaining that
because of her mother's move, she did not have internet until
that day; additionally, Respondent expressed her dissatisfaction
regarding Petitioner's conduct in contacting the Italian
authorities and calling Respondent's friends in Italy about her
departure from Italy. (Tr. 473:11-474:2; Resp. Exh. W, at 1.)
In her April 30, 2012 e-mail, Respondent questioned why
Petitioner did not attempt to contact her brother, sister, or
father, whose contact information Petitioner possessed and
further stated that she had told Petitioner that she was coming
to the United States and that he knew it. (Resp. Exh. W, at 1.)
Respondent also called Petitioner via international calling card

about a week after her arrival in the United States. (Tr. 416:10-19.)  In addition to staying at her mother's new house during her first few weeks in the United States, Respondent testified that she visited and stayed with different family members, periodically providing Petitioner with updates about her location. (Tr. 416:3-9.)

On May 16, 2012, Petitioner sent Respondent an e-mail requesting her to bring the children back to Italy; Respondent responded by e-mail on May 21, 2012 informing Petitioner of her return trip to Italy scheduled for May 24th. (Pet. Exh. 46, at 1.)  In a May 23, 2012 email, Respondent indicated that she prolonged her stay beyond the May 24th date and stated that Petitioner and her attorney had not responded for several weeks to her questions as to what action Petitioner took against her. (*See* Pet. Exh. 46, at 2.)

On or around June 6, 2012, Petitioner filed an application under the Hague Convention with the Italian Central Authority, (Tr. 108:1-5.), although it does not appear that Respondent was notified of that Hague Convention application.  A day later on June 7, 2012, Respondent sent an e-mail to Petitioner, stating that (1) she wished to see receipts of certain gas and internet bills; (2) she has always been a freelance worker and has never hid money from Petitioner; (3)

she is a "resident" of the United States and a "freelance"
worker for United States companies; and (4) Petitioner could
have the children for the summer and "pick them up on the 24th."
(Resp. Exh. V, at 1.)  Around this time in early June,
Respondent contacted Jeremy Morely, Esq., an international
attorney whose practice includes Hague Convention complaints,
for legal advice. (Tr. 393:6-395:5.)  Later that month,
Respondent purchased a new United States cell phone. (Tr.
478:21-479:3; Resp. Exh. X, at 1.)

On June 24, 2012, Respondent sent Petitioner an e-
mail, in which she expressed her intent to remain in the United
States with the children and stated the following:

> Fabrizio,
>
> Due to your failure to support the children
> and I by not paying 9 months support and 18
> months of our rent which had caused us to be
> evicted. The children and I are staying here
> in the United States because I have found a
> job and will provide them with the necessary
> care in a stable enviornment [sic].
>
> regards,
>
> Louise Gallagher Pignoloni

(Resp. Exh. U, at 1; Tr. 491:7-492:6.)[14]  Consistent with this e-

---

[14] According to Respondent, at some point in June 2012, prior to
Respondent's transmission of the June 24, 2012 e-mail to Petitioner, Polo
expressed its desire for Respondent to carry out certain projects between
July 12 to the end of the summer but was waiting for approval from the
Finance Department. (Tr. 491:14-22.)  That job – referenced in Respondent's

mail, Respondent credibly testified that when she initially departed Italy on April 24, 2012, she had not yet made the decision to remain in the United States and only decided to stay in the United States with the children several weeks after their arrival in the United States, at which time she informed Petitioner of her intentions via the aforementioned e-mail sent on June 24, 2012. (Tr. 294:9-15, 295:14-24, 396:14-21.) Respondent further explained that she initially left Italy to attend her godson's party with the intention to return to Italy in May 2012, and, therefore, left most of her and the children's possessions in Italy. (Tr. 403:17-404:11.)  Upon deciding to remain in the United States, Respondent decided to reside at her grandmother's house, which is Respondent's current address.[15] (Tr. 418:14-18.)

### H. Petitioner's Arrival in New York in June 2012 and the Instant Hague Convention Petition Filed in This Court

On June 26, 2012, Petitioner arrived in New York for a

---

June 24, 2012 e-mail – ultimately fell through because Polo's Finance Department did not approve it. (Tr. 491:23-25.)  Respondent testified, however, that, at that time she sent the June 24, 2012 e-mail to Petitioner, she was also working on a pattern-making project for Polo in a different department. (Tr. 491:25-492:6.)

[15] Respondent testified that she gave her grandmother's address to Petitioner but does not recall when she did so. (Tr. 418:7-16.)  Petitioner, however, testified that, at some point in the first week of July, he learned where Respondent was residing from the United States Department of State and from a private investigator whom he hired. (Tr. 108:22-109:2.)  The court need not resolve this conflicting testimony because whether and when Respondent informed Petitioner of her grandmother's address does not affect the court's analysis under the Hague Convention or the April 2011 Separation Agreement. *See* Conclusions of Law *infra*.

meeting with attorney Robert Arenstein, Esq., counsel of record,
to complete necessary paperwork for Petitioner's Hague
Convention complaint.[16] (Tr. 109:4-9, 111:2-7.)  On June 29th,
Respondent sent an e-mail to Petitioner with attached photo
files labeled with the children's names asking whether
Petitioner had entered her apartment recently and expressing
that she needed a "registered Polo laptop, coded and with high
security," to be returned to Polo's Bologna office, and offering
to provide the address in Bologna if Petitioner needed it.
(Resp. Exh. O, at 3-4; *see* Tr. 114:2-7.)  On the following day,
June 30th, Petitioner responded to Respondent's e-mail and told
her that he was in Italy, although he testified that he was
actually in New York and that he was "forced to lie" about his
location in an attempt to learn Respondent's address. (Tr.
116:15-20, 118:11-13.)  Specifically, Petitioner's e-mail
contained the following relevant language:

> I am in Ascoli today and i will try to get
> in to your new house in vallesenzana tonight
> or tomorrow but if I can't . . . . i have to
> call the pompieri to open the gate and the
> door.  anybody has the keys???? [. . . .] I
> have to enter because i must return the
> apartment to the owner.  also . . . what
> about your car??? I hope you didn.t leave
> somewhere you will get so many tickets and

---

[16] Although Petitioner testified that he came to New York on June
25, 2012, Petitioner's passport bears a United States Department of Homeland
Security admission stamp dated June 26, 2012. (Tr. 117:22-24; Pet. Exh. 47,
at 2.)

26

> they will send it the bill there so . . . .
> If it is somewhere tell me, at least i can
> sell it for you and then send you your
> money. I think you can still make 5.000-
> 6.000 euros with that. about your computer
> no problem. I will send to polo in bologna.
> let me know the address.

(Resp. Exh. O, at 3.) Petitioner testified that in this e-mail, he was lying to Respondent because he was attempting to obtain information on the location of Respondent and the children. (Tr. 116:15-20, 118:11-13.) Petitioner further testified that he asked Respondent who had the keys to the apartment in Italy because he thought that if Respondent gave the apartment keys to someone, that person would likely be an accomplice to her removal of the children from Italy. (Tr. 128:6-13.) Respondent, however, understood Petitioner's June 30th e-mail as an indication that he was willing to assist her in selling her possessions, send her the proceeds, and return her work laptop to Polo's Bologna office. (Tr. 297:17-21.)

On July 3, 2012, Petitioner filed the instant Hague Convention petition for wrongful removal and retention against Respondent in the United States District Court for the Eastern District of New York. (Tr. 108:6-13.) Later that July, Petitioner returned to Italy and visited the apartment where Respondent and the children resided immediately prior to their departure to the United States. (Tr. 109:13-19.) Petitioner

entered the apartment at the request of the homeowner who reported a smell emanating from the house. (Tr. 109:23-110:2.) Petitioner testified that the apartment was dirty and odiferous and that he saw all of Respondent's and the children's belongings in the apartment. (Tr. 110:2-11.) Petitioner also reported that the children's pet peacock was dead in the house. (Tr. 110:12-17.) Petitioner testified that he continued to pay rent for this apartment as of the date of his trial testimony on August 23, 2012. (Tr. 110:22-23.)

## I.  The Current Status of Respondent and the Children in the United States

Between July 8 and July 26, 2012, Respondent worked for 35 to 40 hours per week for Polo. (Tr. 494:2-21.) By letter dated July 26, 2012, Peter Sjonell, a Vice-President of Design Development at Polo wrote that Respondent, "a technical designer, has been providing 35-40 hours of paid consultation services per week to Ralph Lauren Polo Brands and it is anticipated that she will continue to do so for the foreseeable future." (Resp. Exh. K, at 1.) In particular, Respondent worked on a pattern-making project for about a week or two for one of Polo's design departments. (Tr. 385:1-4.) Since August, 21, 2012, Respondent has been working as a technical designer for the sweater department at Polo, filling in full time for an

employee on maternity leave until January 2013. (Tr. 495:4-12.)

Petitioner registered the children for the 2012-2013 school year in Italy, which was scheduled to begin the first week of September. (Tr. 111:17-21.) Respondent, however, also enrolled the children to attend school in New York, beginning in September. (Tr. 421:1-9.) According to Respondent, the children have also been examined by doctors in New York, and Petitioner is listed as a contact on their medical information forms. (Tr. 421:18-25.) Specifically, Petitioner testified that Respondent e-mailed him to inform him that she recently took A.T.P. to a physician at Columbia University Hospital. (Tr. 112:9-113:19.)

**J.    Additional Relevant Financial and Employment Information**

The parties' respective financial circumstances during their marriage and their subsequent separation are relevant to this court's application of Paragraph O of the April 2011 Separation Agreement as well as the court's analysis under the Hague Convention. As such, set forth below are additional relevant facts regarding the parties' income, financial histories, and estimated expenses, all of which were established by credible testimony or admissible evidence adduced at trial.

First, the record contains evidence of Petitioner's income level during the course of his marriage to Respondent.

Since A.T.P.'s birth in September 2008, Petitioner testified that his average annual income has been between € 20,000 and € 25,000. (Tr. 28:15-19.) Specifically, Petitioner testified that his annual income was approximately € 17,000 in 2008; approximately € 16,000 to € 17,000 in 2009; approximately € 20,000 in 2010; and approximately € 25,000 to 26,000 in 2011. (Tr. 517:15-21.)

Second, the trial record similarly contains evidence of Respondent's financial condition during the years preceding her removal of the children from Italy. For example, Respondent testified that, at the time she initially moved to Italy in 2006 with the eldest son, she had personal savings, but, between 2006 and 2010, depleted those savings to pay for household items, to contribute to car and travel payments, and to buy food and clothing for the children. (Tr. 271:8-15.) The record further indicates that Respondent's gross income from Polo amounted to $27,580 in 2010 and $16,280 in 2011. (Tr. 274:11-14, 313:15-19, 314:1-7; Resp. Exh. C, at 3; Resp. Exh. I, at 1.) Deducting withheld taxes as well as social security and Medicare payments, Respondent's income was $20,389 in 2010, and $12,839.11 in 2011.[17] (Resp. Exh. C, at 3; Resp. Exh. I, at 3.) In 2011,

---

[17] At trial, counsel for Petitioner asserted that there was a discrepancy of at least $3,000 in Respondent's 2011 income. (Tr. 342:15-19.) Although given the opportunity to brief this discrepancy with the requisite

Respondent also worked for Belstaff, a British fashion design company, and Frankie & Ava, another design company, on relatively short-term projects in 2011. (Tr. 317:13-19.) The record indicates that the 2011 income derived from Respondent's work on the Frankie & Ava project, in the amount of € 2,500, was deposited into Respondent's Italian bank account and is not reflected in any tax return in any country. (Tr. 318:12-319:2; Pet. Exh. 39, at 1-3.) Additionally, Respondent testified that income derived from her work on the Belstaff project was deposited into her corporate bank account and is reflected on her United States corporate tax return. (Tr. 317:18-318:3.) Finally, between January 2012 and April 24, 2012, Respondent was paid approximately $13,740 from Belstaff and Polo. (Tr. 376:21-378:10; Pet. Exh. 38, at 9-10; Pet. Exh. 37, at 19.) According to Respondent, her income increased at the end of 2011, and into 2012, because she was looking for more work in light of Petitioner's failure to pay rent for eighteen months and monthly support of € 500 for Respondent and the children after September 2011. (*See* Tr. 281:1-282:8.)

Third, evidence in the record demonstrates that

detail and citations to evidence in the record, Petitioner failed to do so in his post-trial memorandum. The court, upon engaging in an independent review of the record, finds no such discrepancy and relies upon Respondent's personal and business income tax returns and other admitted exhibits as reliable measures of Respondent's 2011 income.

Respondent's company, Spec Tech Direct, reported an operating loss of $4,061 in 2004. (Tr. 320:1-11, Resp. Exh. S, at 6.) In 2005, the company reported an operating loss of $650. (Tr. 320:14-16, Resp. Exh. S, at 6.) In 2008, the company sustained a loss of $8,991. (Tr. 320:17-18, Resp. Exh. S, at 6.) In 2009, the company reported a loss of $575. (Tr. 320:19-23, Resp. Exh. S, at 6.) In 2010, the company reported a loss of $5,220. (Tr. 274:2-4; 321:15-17, Resp. Exh. S, at 6.) In 2011, the taxable income for Spec Tech Direct amounted to zero, and the company's gross income, which included income from Polo and Belstaff, amounted to $13,507, after deducting the company's losses for only that year without accounting for the significant losses sustained in earlier years.[18] (Tr. 285:12-286:6; Resp. Exh. S, at 1-6.)

Fourth, the record also provides the following evidence regarding the joint finances of Petitioner and Respondent during their marriage. Specifically, Petitioner and

---

[18] Petitioner's counsel explained that his cross-examination of Respondent regarding her company's losses was predicated on the speculative theory, unsupported by evidence in the record, that Respondent was reporting corporate losses sustained in prior years as a deduction on her 2011 corporate tax return, hiding income in corporate losses, and strategically reporting income so as to minimize the level of her income. Aside from the lack of sufficient evidence to support such a theory, counsel for Petitioner has failed to demonstrate that the Respondent's tax returns, income statements, and work invoices indicate any inaccuracies or irregularities regarding her personal and corporate finances, which returns were prepared by her accountant. Furthermore, when asked whether he had any evidence that Respondent was hiding personal losses and expenses in her corporate tax returns, counsel for Petitioner conceded that he had none. (Tr. 323:2-17.)

Respondent shared a joint checking account, the primary purpose of which was to purchase a house in the Italian countryside. (Tr. 43:14-21, 44:3-6.) In 2010, Respondent contributed € 5,000 for a loan application to finance the country home, and Petitioner, after first testifying that he did not recall that Respondent ever paid for anything during their marriage, then admitted that Respondent had paid € 5,000 for the house in which Petitioner currently resides. (Tr. 132:7-11, 133:20-134:14, 272:1-12; Resp. Exh. D, at 1-2.) Petitioner further testified that Respondent wanted to back out of the loan.[19] (Tr. 137:1-18) Petitioner never returned the € 5,000 to Respondent but stated that he gave her a car. (Tr. 132:12-25, 136:18-137:11.) The April 2011 Separation Agreement, however, required that Petitioner was to transfer the car to Respondent without consideration. (Resp. Exh. T, at 4.) Respondent testified that the € 5,000 was a substantial amount of money for her in 2010 because she was not working full-time. (Tr. 272:13-15.) Respondent further testified that, at some point, she also transferred $10,000 into the checking account that she shared

---

[19] Petitioner testified that both he and Respondent each initially contributed approximately $4,000 into the joint account. (Tr. 44:10-13.) The record is unclear, however, regarding whether this $4,000 is separate from Respondent's € 5,000 contribution for a loan application to finance the home in which Petitioner now resides. When the court asked whether the € 5,000 was "in addition to the $4,000 . . . in the joint account," the Petitioner did not provide a responsive answer, only indicating that the money "was a loan petition." (Tr. 133:12-19.)

with Petitioner. (Tr. 271:20-25.)

Finally, both Respondent and Petitioner provided conflicting testimony regarding the estimated costs and expenses for Respondent and the children to live in Ascoli Piceno, Italy. Petitioner testified that, as a general matter, the average annual income in Italy is approximately € 18,000 and that this average income is sufficient to support an adult and two children in Ascoli Piceno. (Tr. 517:23-518:3.) Petitioner, however, did not explain the basis upon which he determined the average annual income in Italy, and the court does not find Petitioner's testimony to be determinative or reliable on this issue.

The parties further provided the following estimates of living expenses in Ascoli Piceno, Italy. The majority of the following expenses are set forth in the parties' April 2011 Separation Agreement.

- Rent in Italy: Respondent estimated that the average rent expenses amounted to € 800-1,200 per month. (Tr. 428:7-9.) Petitioner estimated a monthly average cost of € 600 for Respondent's current apartment and indicated that the rent for the Via Minucia apartment was approximately € 450 per month at a maximum. (Tr. 508:8-23.) Because Petitioner's estimates for rent expenses in Italy accord with the rent payments enumerated in Paragraph F of the April 2011 Separation Agreement, (Resp. Exh. T, at 3), the court will use the Petitioner's monthly estimates of € 450 and € 600 in the calculations to account for the cost of the Via Minucia apartment and the apartment in which

Respondent most recently resided, respectively.

- Education: Respondent estimated a cost of € 150 per
  month for E.G.P.'s private school education but
  indicated that Petitioner was responsible for paying
  for those costs. (See Tr. 429:18-25)  Petitioner
  estimated that educational costs for E.G.P.'s school
  amounted to approximately € 100 per month. (Tr. 513:9-
  24.)  Because, as Respondent testified, Petitioner was
  typically responsible for school payments, the court
  will use Petitioner's monthly estimate of € 100 in the
  calculations below.[20]

- Medical Care: Although Petitioner testified that he
  paid for all of the family's medical care (Tr. 38:22-
  25), Respondent and Petitioner agreed that medical
  care for the family, including care for A.T.P.'s
  muscular dystrophy, was free in Italy. (Tr. 430:17-22,
  514:10-15.)

- Medication: Respondent estimated a monthly medication
  cost of € 50-75 (Tr. 430:23-25), and Petitioner
  estimated a monthly cost of € 30. (Tr. 514:16-25.)
  Because Petitioner was obligated to pay for medical
  expenses under the parties' April 2011 Separation
  Agreement, (see Resp. Exh. T, at 3), the court will
  use the Petitioner's monthly estimate of € 30 in the
  calculations below.

- Children's Extracurricular Activities and
  Entertainment: Respondent estimated that three months
  of E.G.P.'s swimming lessons cost € 70. (Tr. 431:11-
  18.) She estimated a total expenditure of € 80-100 for
  three months per child for extracurricular activities
  and entertainment. (Tr. 432:1-7.)  Petitioner,
  however, testified that E.G.P.'s swimming lessons cost
  € 70 for nine months. (Tr. 513:18-514:7.)  He further
  testified that entertainment for the children, such as
  movies, would cost around € 200 per month. (Tr.
  516:18-517:3.)  Because Petitioner was obligated to

---

[20] The court's use of Petitioner's estimates for the following
enumerated expenses does not amount to a determination that Petitioner
actually paid for those expenses during 2011 and early 2012.  The record does
not support such a finding.

pay for the children's extracurricular activities under the April 2011 Separation Agreement, (*see* Resp. Exh. T, at 3), the court will use the Petitioner's nine-month estimate of € 70 for E.G.P.'s swimming lessons and his monthly estimate of € 200 for the children's other extracurricular activities and entertainment in the calculations below.

- <u>Airline Tickets</u>: Respondent testified that airline tickets for her and the children cost € 3,500 annually, excluding Respondent's business travel. (Tr. 432:19-25.) Petitioner, however, provided an estimate of € 2,000 annually for the entire family. (Tr. 516:3-8.) Despite their conflicting testimony, the court finds Respondent's testimony to be more credible, especially given her familiarity with airline rates to the United States that arose from her relatively routine and recent travel to New York in order to work for Polo at various times and to visit her family during the holiday season when airline tickets are likely more expensive. Although Petitioner was obligated to "contribute to the purchase of the children's airline tickets" under the April 2011 Separation Agreement, Petitioner was not responsible for covering the entire cost of the children's airline tickets and was not obligated to pay for Respondent's airline tickets. (Resp. Exh. T, at 3.) Thus, the court will utilize Respondent's annual estimate of € 3,500 in the calculations below.

- <u>Light/Electricity</u>: Respondent estimated that monthly light and electricity expenses amounted to € 80-100 and provided documentation for the months of August and September 2011 indicating a bill of € 120.83 for those two months. (Tr. 433:8-10, 528:9-18; Resp. Exh. AA, at 1.) Petitioner testified that the electricity bill was paid for every two months at an average rate of € 80 for every bi-monthly bill and provided documentation for the months of October and November 2011 indicating a bill of € 68.40 for those two months. (Tr. 509:1-3; Pet. Exh. 30, at 1.) The court shall rely upon the documentary evidence provided by the parties and will use the bi-monthly average of the two amounts, around € 94.62, set forth in the two documentary exhibits for the purposes of the

calculations below.

- Home Telephone and Internet: Respondent testified that home telephone and internet bills, including DSL, amounted to € 80 per month, whereas Petitioner testified that the bill amounted to € 60 for two months. (Tr. 433:11-15, 511:19-23.) Because Respondent was responsible for payment of her own home telephone and internet costs under the April 2011 Separation Agreement, (*see* Resp. Exh. T, at 3-4), the court finds that Respondent's estimate more likely accords with the actual costs of her personal home telephone and internet costs and will therefore use her monthly estimate of € 80 in the calculations below.

- Cell phone: Respondent testified that her cell phone bill amounted to € 75-200 per month. (Tr. 433:16-20.) Petitioner did not dispute this figure. The court will utilize the average of the range, or € 137.50, as the monthly estimate for Respondent's cell phone costs in the calculations below.

- Waste disposal: Petitioner estimated waste disposal costs of € 200-250 annually (Tr. 517:9-12.) The court will utilize the average of the range, or € 225, as the annual estimate for Respondent's waste disposal costs in the calculations below.

- Heating: Respondent estimated that heating expenses amounted to € 3,000 annually. (Tr. 434:17-19.) Petitioner estimated an annual heating cost of € 1,500. (Tr. 511:3-8.) Because Petitioner was responsible for payment of Respondent's heating bills under the April 2011 Separation Agreement, (*see* Resp. Exh. T, at 4), the court will use Petitioner's annual estimate of € 1,500 in the calculations below.

- Water: Petitioner estimated a water bill of € 100-200 every five to six months (Tr. 531:14-20.) The court will utilize the average of the range, or € 150, as the semiannual estimate for Respondent's water expenses in the calculations below.

- "Sky" Cable Television: Respondent estimated a monthly television bill of € 80-100, whereas Petitioner estimated a monthly bill of € 29 for the cable television channels Respondent watched, which did not include added charges for soccer games. (Tr. 434:20-23, 512:12-513:6.) Because Petitioner was responsible for payment of bills related to cable television under the April 2011 Separation Agreement, (*see* Resp. Exh. T, at 4), the court will use Petitioner's monthly estimate of € 29 in the calculations below.[21]

- Automobile Insurance: Respondent estimated that annual automobile insurance expenses amounted to € 2,600 because she was considered a new driver. (Tr. 434:24-435:6.) Petitioner admitted that, as a new driver, Respondent paid "something more" but denied that the cost for first year drivers was € 2,600. (Tr. 515:18-516:2.) Because the April 2011 Separation Agreement appears to place the cost of car insurance on Respondent, (Resp. Exh. T, at 4), the court finds that Respondent's estimate more likely accords with the insurance costs of a first year or "new" driver and will use her annual estimate in the calculations below. Additionally, the court finds Respondent's testimony to be more credible and reliable than Petitioner's equivocal testimony because she, as a new driver, is likely more familiar with the car insurance rates for new drivers than is Petitioner.

- Automobile Maintenance: Respondent estimated an annual cost of € 400-500 for car maintenance, for which she was responsible under the April 2011 Separation Agreement. (Tr. 435:13-15; Resp. Exh. T, at 4.) The court will utilize the average of the provided range, or € 450, as the annual estimate for Respondent's car maintenance costs in the calculations below.

- Automobile Tax: Petitioner testified that drivers were required to pay € 100-150 per year in automobile taxes. (Tr. 526:7-16.) The court will utilize the average of the range, or € 125, as the annual estimate

---

[21] The record contains no evidence of whether Respondent was also a soccer fan, in which case she would have to incur the added costs associated with those channels showing soccer matches.

for Respondent's automobile taxes in the calculations below.

- <u>Gas</u>: Respondent testified to monthly gas costs of € 100-200. (Tr. 435:16-18.) Petitioner testified that those costs only amount to € 50. (Tr. 518:15-19.) Because Respondent is most familiar with the frequency and extent of her car use, the court finds her testimony regarding gas costs to be more credible and representative regarding her actual gasoline expenses. Thus, the court will use the average of Respondent's range, € 150, as the monthly estimate of Respondent's gas costs.

- <u>Childcare</u>: Respondent estimated monthly childcare costs of € 900-1,000 for full coverage for entire weeks at a time; however, Respondent testified that she did not usually need full coverage and also testified that childcare costs differed depending on the time of the year. (Tr. 436:3-11.) Petitioner estimated that childcare would only be needed for four hours per day, and would cost € 5 to € 7 per hour. (Tr: 519:1-11.) Because neither party has offered a concrete monthly or annual estimate for childcare costs, the court is unable to estimate the annual cost, but recognizes that childcare costs would constitute a significant expense for Respondent.

- <u>Legal Fees</u>: Respondent testified that she estimated € 7,000-8,000 annually in legal fees after the separation. (Tr. 437:4-6.) Counsel for Petitioner strongly objected to the inclusion of such costs in any calculation. (Tr. 437:7-11.)

- <u>Food and Sundries</u>: Respondent estimated a monthly cost of € 400-500 for food and sundries. (Tr. 438:2-9.) Petitioner estimated that these costs only amounted to € 200 because his mother owns a store where Respondent can obtain food for free. (Tr. 516:9-17.) Because Respondent is most familiar with the costs of her food and sundries, the court finds her testimony regarding such costs to be more reliable as to the estimate of her monthly expenses. Moreover, it is not certain that Petitioner's mother will continue to provide Respondent with food from her store. The court will

thus use an average of Respondent's estimated range, € 450, as the monthly estimate of Respondent's food and sundries costs.

- <u>Clothing</u>: Respondent unequivocally testified that clothing for herself and for her children would cost an average of € 3,000 per year. (Tr. 438:10-16.) When asked to estimate costs for the children's clothing, Petitioner claimed that he included the estimate for children's clothing in his previous estimate of € 200 per month for the children's entertainment. (*See* Tr. 518:20-23.) Petitioner then testified "I don't know. If you want to say another 100. The 200 I mentioned before I was talking also for clothes for the kids." (Tr. 518:21-23.) The court does not find credible or reliable Petitioner's equivocal statement that his initial € 200 estimate for the children's entertainment activities included their clothing costs. Petitioner himself indicated that when estimating the children's entertainment expenses, he was "thinking movies, cinema theater, couple of hundred euros more for the other expenses" and did not appear to consider clothing in that estimate until asked later by his attorney. (Tr. 516:20-517:6.) Even if that ambiguous estimate included a credible estimate for the children's clothing, Petitioner's estimate did not account for Respondent's clothing costs, and his testimony on the cost of the children's clothing is not inconsistent with Respondent's credible testimony about her annual clothing estimate for herself and the two growing children. Accordingly, the court will use Respondent's annual estimate of € 3,000 in its calculations below.

## II. <u>Procedural History</u>

On July 3, 2012, Petitioner filed the instant action and a request for an order to show cause pursuant to the Hague Convention, requesting the court to (1) direct Respondent to give immediate and ongoing contact and access to the children; (2) prohibit Respondent from removing the children from New York

during the pendency of the action; (3) command Respondent to appear in court with the children and show cause why the children should not be returned to Italy, their alleged habitual residence; (4) direct the prompt return of the children to Italy; and (5) direct Respondent to pay Petitioner's legal costs and fees. (*See* ECF No. 1, Petitioner's Hague Convention Petition ("Petition"), at 1-8.)

On July 3, 2012, the court issued an Order to Show Cause, directing the Respondent to appear with the children before the court on July 31st and to show cause why the court should not issue an order directing Respondent to return the children to Italy and to pay Petitioner's legal fees and costs. (ECF No. 4, Order to Show Cause dated 7/3/12 ("Order to Show Cause"), at 1-2.) The court further prohibited Respondent from removing the children from New York during the pendency of this action and ordered Respondent to deposit the passports of the children with the Clerk of the Court. (*Id.* at 2) Finally, the court ordered Petitioner to serve the Order to Show Cause and his underlying petition and motion papers upon Respondent by personal service on or before July 10, 2012. (*Id.*)

On July 11, 2012, Petitioner faxed a letter to the court[22] stating that despite his numerous attempts to personally serve Respondent pursuant to the Order to Show Cause, Petitioner had been unable to timely serve her at the Staten Island home address provided by the United States Department of State. (ECF No. 5, Letter from Petitioner dated 7/11/12 ("7/11/12 Pet. Letter"), at 1.)[23] In light of Petitioner's unsuccessful efforts, Petitioner requested that the court (a) extend the deadline for effecting service on Respondent; (b) allow Petitioner to serve by substituted service on Respondent's grandmother; or (c) order the United States Marshal to serve the papers on Respondent. (*Id.*)

On July 19, 2012, the court extended the time to serve Respondent and permitted "substitute service by serving . . . [Respondent's] mother at [Respondent's] Address . . . or serving [Respondent] in any manner reasonably effective to give [her] notice of the suit and show-cause hearing on July 31, 2012."

---

[22] This case was initially sealed pursuant to the court's July 5, 2012 Order to Show Cause, rendering Petitioner's counsel unable to file this letter via ECF on July 11, 2012. (Order to Show Cause, at 2.) The case has since been unsealed upon consent of the parties. (ECF No. 14, Order Unsealing Case dated 8/15/12.)

[23] Although Petitioner engaged a private investigator to serve Respondent at the Staten Island address, the private investigator was initially unable to physically locate Respondent. (7/11/12 Pet. Letter, at 1) The private investigator found Respondent's grandmother at the Staten Island address, but Respondent and the children were not present. (*Id.* at 2.) Respondent's grandmother did acknowledge that Respondent lives at that address, however. (*Id.* at 1.)

(*See* ECF No. 6, Order Extending Time to Serve dated 7/19/12, at 2-3.)  On July 26, 2012, the Clerk of the Court received the children's passports.

On July 27, 2012, Respondent filed her Answer to the Hague Convention Petition. (*See* ECF No. 10, Respondent's Verified Answer ("Resp. Ans.").)  In that Answer, Respondent argued that her removal and subsequent retention of the children in the United States were justified because the conditions of Paragraph O of the April 2011 Separation Agreement were satisfied by (1) Petitioner's failure to pay rent and support payments and (2) Respondent's acquisition of stable employment with Polo. (Resp. Ans. ¶¶ 35-42.)

On July 31, 2012, the court held a show cause hearing at which the children and both parties were present with counsel. (*See* Order and Minute Entry dated 7/31/12.)  At that hearing, the court scheduled a bench trial and granted Petitioner permission to visit the children under conditions agreed upon by both parties. (*Id.*)  After pre-trial briefing on evidentiary matters and the court's attendant rulings on those matters, the court held a three-day bench trial on August 23rd, 24th, and 27th and granted the parties' requests to submit post-trial briefing on or before September 12, 2012.  (*See* Order and Minute Entry dated 8/27/12.)

On September 10, 2012, Petitioner and Respondent jointly requested a twelve-day extension of time to file their post-trial memoranda, which the court granted in order to permit the parties to obtain copies of the trial transcript. (*See* Order and Minute Entry dated 9/10/12.)  On September 24, 2012, the parties timely submitted their respective post-trial memoranda. (*See* ECF No. 31, Post-Trial Memoranda by Fabrizio Pignoloni ("Pet. Post-Trial Mem."); ECF No. 32, Post-Trial Memoranda by Luise Ann Gallagher (Resp. Post-Trial Mem.").)

## APPLICABLE LAW

## I.  The Hague Convention and ICARA

The Hague Convention governs both the wrongful removal and wrongful retention of children from their habitual residence.  *See* Hague Convention, art. 1(a); 42 U.S.C. § 11601(a)(4).  Both the United States and Italy are signatories to the Hague Convention, which was implemented in the United States through Congress' adoption of ICARA.  *See Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010).

"The Hague Convention was adopted in 1980 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of

access." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005)
(citing Hague Convention, Preamble); *see also A.A.M. v.
J.L.R.C.*, 840 F. Supp. 2d 624, 629-30 (E.D.N.Y. 2012) (citing
*Gitter*, 396 F.3d at 129), *aff'd*, *Mota v. Castillo*, 692 F.3d 108
(2d Cir. 2012). A petitioner "cannot invoke the protection of
the Hague Convention unless the child to whom the petition
relates is 'habitually resident' in a State signatory to the
Convention and has been removed to or retained in a different
State. The petitioner must then show that the removal or
retention is 'wrongful.'" *Gitter*, 396 F.3d at 130 (footnote
omitted).

### A. Petitioner's *Prima Facie* Case

Petitioner and Respondent bear specific burdens of
proof set forth in ICARA. First, Petitioner has the *prima facie*
burden of proving, by a preponderance of the evidence, that the
children have been "wrongfully removed or retained within the
meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). Under
Article 3 of the Hague Convention, the removal and retention of
a child abroad is considered wrongful when:

> (a) it is in breach of custody rights
> attributed to a person, an institution or
> any other body, either jointly or alone,
> under the law of the State in which the
> child was habitually resident immediately
> before the removal or retention; and (b) at
> the time of the removal or retention those

> rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3.

Accordingly, to establish a *prima facie* case, Petitioner must prove by a preponderance of the evidence that: (1) the children were habitually resident in Italy, but were removed to or retained in the United States; and (2) the removal or retention was in breach of Petitioner's custody rights under the law of Italy, and Petitioner was exercising those rights at the time of the children's removal to or retention in the United States. *See Gitter*, 396 F.3d at 130-31 (citing 42 U.S.C. § 11603(e)(1)(A)).

  1.   *Habitual Residence*

Neither the Hague Convention nor ICARA defines "habitual residence," *Gitter*, 396 F.3d at 131; *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 147 (2d Cir. 2008), *vacated on other grounds*, 130 S. Ct. 3318 (2010); however, the Second Circuit has articulated the following standard:

> First, the court should inquire into the shared intent of those entitled to fix the

> child's residence (usually the parents) at
> the latest time that their intent was
> shared. In making this determination the
> court should look, as always in determining
> intent, at actions as well as declarations.
> Normally the shared intent of the parents
> should control the habitual residence of the
> child. Second, the court should inquire
> whether the evidence unequivocally points to
> the conclusion that the child has
> acclimatized to [a] new location and thus
> has acquired a new habitual residence,
> notwithstanding any conflict with the
> parents' latest shared intent.

*Gitter*, 396 F.3d at 134. The Second Circuit has further noted that "[i]n the easy case, the parents . . . will agree on where the child's habitual residence is fixed"; however, in nearly every case arising under the Convention, the court must "determine the intentions of the parents as of the last time that their intentions were shared." *Gitter*, 396 F.3d at 133. The Second Circuit has confirmed that the "parties' shared intent is a 'question of fact to which [it] defer[s] to the district court." *Daunis v. Daunis*, 222 F. App'x 32, 34 (2d Cir. 2007) (summary order) (quoting *Gitter*, 396 F.3d at 132); *see Adamah v. Tayson*, No. 09-CV-5477, 2010 WL 2265308, at *5 (E.D.N.Y. May 28, 2010) (quoting *Gitter*, 396 F.3d at 133) ("The intent of the parties is a 'question of fact' to be determined by the district court.").

2.     *Petitioner's Custody Rights and Exercise of Those Custody Rights*

"Under the [Hague] Convention and ICARA, a federal court looks to the law of the child's place of habitual residence to determine whether a petitioner possessed lawful rights of custody at the time of a child's removal." *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 638 (E.D.N.Y. 2000) (citing Hague Convention, art. 3). Therefore, if the court finds that Italy is the children's habitual residence, the court shall then determine whether Respondent's removal and/or retention was in breach of Petitioner's rights under Italian law.

"Under the Hague Convention, custody rights are defined as rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Poliero v. Centenaro*, No. 09-CV-2682, 2009 WL 2947193, at *11 (E.D.N.Y. Sept. 11, 2009) (citing Hague Convention, art. 5), *aff'd*, 373 F. App'x 102 (2d Cir. 2010) (summary order). "[T]here are three possible sources of 'rights of custody:' judicial or administrative decisions, legally binding agreements between the parties, and operation of the law of the State." *Norden-Powers*, 125 F. Supp. 2d at 638 (citing Hague Convention, art. 3).

In determining whether Respondent wrongfully removed or retained the children under the Hague Convention, the court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention, art. 14. Finally, even upon proof that Petitioner has custody rights, Petitioner "must prove that he was actually exercising his rights of custody at the time of the retention." *Radu*, 805 F. Supp. 2d at 11 (citing Hague Convention, art. 3); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 203 (E.D.N.Y. 2010) (citing Hague Convention, art. 3(b), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) (summary order).

## B. Respondent's Affirmative Defenses

If a court deems that there has been a wrongful removal or retention of a child under the age of sixteen, "the court must ordinarily 'order the return of the child forthwith.'" *Mota*, 692 F.3d at 113 (quoting Hague Convention, art. 12). "A court is not bound to order the child's return if the respondent can successfully establish that any of four statutory exceptions applies." *Id.* (citing Hague Convention, arts. 12, 13, 20; 42 U.S.C. § 11603(e)(2)); *Blondin v. Dubois*,

189 F.3d 240, 245 (2d Cir. 1999); *A.A.M.*, 840 F. Supp. at 630 (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)).

First, Respondent "may show by clear and convincing evidence that there is a 'grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" *A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague Convention, art. 13(b)); *see* 42 U.S.C. § 11603(e)(2)(A).

Second, Respondent "may show by clear and convincing evidence that the return of the child 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.'" *A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague Convention, art. 20); *see* 42 U.S.C. § 11603(e)(2)(A).

Third, Respondent "may show by a preponderance of the evidence that the return proceeding was commenced more than one year after the child's removal or retention and that the child has become settled in its new environment." *A.A.M.*, 840 F. Supp. 2d at 632 (citing Hague Convention, art. 12); *see* 42 U.S.C. § 11603(e)(2)(B).

Fourth, Respondent "may show by a preponderance of the evidence that 'the person, institution, or other body having the

50

care of the person of the child was not actually exercising the
custody rights at the time of removal or retention, or had
consented to or subsequently acquiesced in the removal or
retention.'" *A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague
Convention, art. 13(a)); *see* 42 U.S.C. § 11603(e)(2)(B).

## II. Paragraph O of the April 2011 Separation Agreement, Choice of Law Analysis, and Italian Domestic Relations and Contract Law Under the Italian Civil Code

### A. Paragraph O of the April 2011 Separation Agreement

The interpretation and application of Paragraph O read
in the context of the April 2011 Separation Agreement[24] is
crucial to the court's ultimate determination regarding whether
the Respondent's removal and retention of the children in the
United States was wrongful. Paragraph O, as translated by the
experienced and impartial court-appointed Italian interpreter,
states as follows:

> [i]n case of non-payment of several monthly
> rent installments by Mr. Pignoloni resulting
> in lawsuits on behalf of the owners / or of
> non-bank-deposit for at least four months of
> the support for the children and for the
> wife and should the wife be unable, not

---

[24] In its analysis, the court focuses primarily upon the April
2011 Separation Agreement, as opposed to the initial September 2010
Separation Agreement, because Paragraph O was a new provision that was
subsequently added to the April 2011 Separation Agreement, upon the agreement
of the parties because Respondent's spousal support was reduced from € 500
per month to € 100 per month in the April 2011 Separation Agreement. The
court has reviewed both agreements and does not find any of the
modifications, aside from the addition of Paragraph O and the change in
spousal and child support payments, to be material. The parties appear to
agree with this conclusion.

> having any type of income of her own, to
> support and maintain the children and
> herself, Mr. Pignoloni is willing to
> authorize the wife to return with the
> children to the United States to her
> family's home provided that the wife proves
> that she has found a job of her own.

(Resp. Exh. T, at 5.) The April 2011 Separation

Agreement was executed by the parties on April 29,

2011, was subsequently ratified by an Italian Judge on

May 25, 2011, (Resp. Exh. T, at 5, 8), and, thus, has

the effect of a court order.

B.  **Choice of Law Analysis**

As a preliminary matter, interpretation and analysis

of Paragraph O and related provisions of the April 2011

Separation Agreement "suggests the need for a choice-of-law

analysis to determine which jurisdiction's law governs their

agreement."[25] *A.A.M.*, 840 F. Supp. 2d at 632. Federal courts

have applied two main approaches in determining which

jurisdiction's law applies in federal-question cases.[26] *See*

---

[25] Although neither party briefed the choice of law issue, the
court, in an abundance of caution, engages in the choice of law analysis to
accurately determine which rules of contract interpretation and construction
should guide the court in interpreting Paragraph O of the April 2011
Separation Agreement, a provision which is essential to this court's ultimate
determination.

[26] The First Circuit has applied a third approach in the context
of Hague Convention cases and has concluded that the Hague Convention and
ICARA require federal courts to conduct a choice-of-law analysis pursuant to
the law of the state where the child was habitually resident. *See Whallon v.
Lynn*, 230 F.3d 450, 456 & n.6 (1st Cir. 2000); *A.A.M.*, 840 F. Supp. 2d at 634
(describing the First Circuit's approach in *Whallon*). That approach,

*Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12-15 (2d Cir. 1996); *A.A.M.*, 840 F. Supp. 2d at 633-34.  Although the federal court "generally appl[ies] federal, rather than state, choice of law analysis to determine which jurisdiction's substantive law is applicable," *A.A.M.*, 840 F. Supp. 2d at 632 (citing *Pescatore*, 97 F.3d at 12-15), some federal "'courts have used the choice of laws rules of the state in which the court sits instead of a federal common law choice of law rule,'" *id.* at 633 (quoting *Pescatore*, 97 F.3d at 12).  Indeed, in the Second Circuit, the law is "'unsettled when it comes to applying either a federal common law choice of law rule or state choice law principles in non-diversity cases.'" *Id.* (quoting *Pescatore*, 97 F.3d at 12).  Nevertheless, both federal and state choice of law approaches demand the application of Italian contract law when interpreting, construing, and applying Paragraph O of the April 2011 Separation Agreement.

---

however, is not appropriate in determining whether United States or Italian contract law governs the interpretation and application of Paragraph O or the Italian Separation Agreements because the interpretation and concomitant application of Paragraph O bear on the court's determination of the children's habitual residence in the first place.  As discussed below, the court's interpretation and construction of Paragraph O are potentially determinative of where the children were habitually resident during their removal to and/or retention in the United States by Respondent.  Thus, the approach in *Whallon* would require this court to apply the choice-of-law principles of the country of the children's habitual residence even before conclusively determining that habitual residence in light of Paragraph O of the April 2011 Separation Agreement, thereby putting the cart before the horse, at least on this unique set of facts.  Accordingly, the court does not find applicable or persuasive the approach set forth in *Whallon* and instead engages in the traditional choice-of-law analysis adopted by the Second Circuit in federal-question cases.

First, under federal common law choice of law rules, the court must "'determine which [. . .] law to use by ascertaining and valuing points of contact between the transaction giving rise to the cause of action and the states or governments whose competing laws are involved.'" *Id.* at 632-33 (quoting *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998)).  In making this determination, federal courts routinely consult the guidelines set forth in the Restatement (Second) of Conflict of Laws (the "Restatement"). *Id.* at 633 (citing *Pescatore*, 97 F.3d at 12).

Section 187 of the Restatement provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1).  The Commentary on Section 187 clarifies that this rule

> is applicable only in situations where it is established to the satisfaction of the forum that the parties have chosen the state of the applicable law. [. . .] [E]ven when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied.  So the fact that the contract contains legal expressions, or makes reference to legal doctrines, that are

54

> peculiar to the local law of a particular
> state may provide persuasive evidence that
> the parties wished to have this law applied.

Restatement (Second) of Conflict of Laws § 187 cmt. a.

Pursuant to Section 187 of the Restatement, the court determines that the parties mutually contemplated the applicability of Italian law to the April 2011 Separation Agreement.  Most tellingly, Petitioner and Respondent entered into their separation agreement in Italy and sought ratification of their separation agreement from an Italian court subsequent to negotiating the terms of and entering into that agreement. (*See* Resp. Exh. T, at 1.)  That fact is indicative of the parties' shared intention that the law of Italy, and not United States, applies to their separation agreement.  Furthermore, no meaningful interest would be furthered by this court's application of United States contract principles to a contract entered into, negotiated, and ratified by the judicial authority in Italy by two parties who were then residents of Italy and represented by Italian counsel.  Accordingly, the federal choice of law analysis demands application of the relevant provisions

set forth in the Italian Civil Code.[27]

Second, New York state choice of law rules similarly dictate that the court apply Italian substantive law in interpreting and applying the provisions of the April 2011 Separation Agreement. New York state courts recognize "the use of 'center of gravity' or 'grouping of contacts' as the appropriate analytical approach to choice of law questions in contract cases." *A.A.M.*, 840 F. Supp. 2d at 633-34 (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton*, 642 N.E.2d 1065, 1068 (N.Y. 1994)) (internal quotation marks omitted). "The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" *Zurich*, 642 N.E.2d at 1068 (quoting Restatement (Second) of Conflict of Laws § 188(1)). For substantially the same reasons articulated above under the federal choice of law analysis, the court determines that Italy is the country with the most significant relationship to the consensual separation agreement

---

[27] Even if Section 187 of the Restatement were inapplicable, Section 188 of the Restatement, which applies in the absence of an effective choice of law by the parties under Section 187, commands the same result under federal choice of law rules. Under Section 188, the court, in determining which jurisdiction's law applies to a contract, considers the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. *See* Restatement (Second) of Conflict of Laws §§ 188(1)-(2). Application of those factors weighs heavily in favor of applying Italian law to the April 2011 Separation Agreement because Italy was the place of contracting, place of negotiation, and residence of the contracting parties at the time the parties entered into the separation agreement.

entered into by Petitioner and Respondent.  The April 2011 Separation Agreement was negotiated in Italy, entered into in Italy with the advice of Italian attorneys, and thereafter approved by an Italian court.  Consequently, Italian substantive law – specifically those provisions set forth in the Italian Civil Code – must guide the interpretation, construction, and application of Paragraph O and the rest of the April 2011 Separation Agreement.

## C. Domestic Relations Law and Contract Law Under the Italian Civil Code

Having determined that Italian law as set forth in the Italian Civil Code applies to the parties' April 2011 Separation Agreement, the court takes judicial notice of and relies chiefly upon the following Italian Civil Code provisions as critical guideposts in its interpretation, construction, and application of Paragraph O and the rest of the April 2011 Separation Agreement.[28]

First, the court considers the following Italian Domestic Relations Law provisions from the Italian Civil Code in its interpretation and application of the April 2011 Separation Agreement:

- Italian Civil Code § 150: *Personal separation.*

---

[28] The following Italian Civil Code provisions are taken from *The Italian Civil Code* (Susanna Beltramo trans., Thomson Reuters 2012).

Personal separation of the spouses is admissible. Separation may be judicial or consensual. The right to request judicial separation or confirmation of consensual separation belongs exclusively to the spouses.

- Italian Civil Code § 155: *Provisions regarding children*. Also in the event of the separation of the parents, the child of minor age has the right to maintain a balanced and stable relationship with each parent; to be looked after, educated and instructed by each of them; and to maintain relevant relationships with the descendants and with the relatives of each parent. [. . .] Parental authority is exercised by both parents. The decisions of major interest for the children on instruction, education and health are taken in agreement between the parents, keeping into account the capacities, the natural inclination and the aspirations of the children. In the case of disagreement, the decision is taken by the judge.

- Italian Civil Code § 155-*ter*: *Changes to the terms of custody of children*. Parents are entitled to request at any time a change of the terms of the custody of the children, the attribution of the powers on them, and the amount and modalities of the payment at their charge.

- Italian Civil Code § 156: *Effects of separation on patrimonial relations between the spouses*. The court in decreeing separation, provides for the right of the spouse to whom separation is not imputable . . . to receive from the other spouse that which is necessary for his maintenance, if he has no adequate income of his own. The extent of such maintenance is determined in relation to circumstances and to the income of the spouse obligated to give it.

- Italian Civil Code § 158: *Consensual separation*. Separation by the mere consent of the spouses has no effect without confirmation by the court. When the agreement of the spouses relating to the custody and maintenance of the children is in contrast with their interests, the court summons again the spouses indicating to them the modifications to be adopted in

the interest of the children and, in the event of an inadequate solution, can refuse confirmation for the time being.

Second, in addition to the Italian Civil Code Provisions regarding the dissolution of marriage and separation of spouses, the court considers the following Italian Contract Law provisions from the Italian Civil Code in its interpretation and application of the April 2011 Separation Agreement:

- Italian Civil Code § 1321: *Notion*. A contract is the agreement of two or more parties to establish, regulate or extinguish a patrimonial legal relationship among themselves.

- Italian Civil Code § 1322: *Contractual autonomy.* The parties can freely determine the contents of the contract within the limits imposed by law. The parties can also make contracts that are not of the types that are particularly regulated, provided that they are directed to the realization of interests worthy of protection according to the legal order.

- Italian Civil Code § 1323: *Rules regulating contracts.* All contracts, even though they are not of the types that are particularly regulated, are subject to the general rules contained in this title.

- Italian Civil Code § 1326: *Formation of contract.* A contract is formed at the moment when he who made the offer has knowledge of the acceptance of the other party.

- Italian Civil Code § 1353: *Conditional contract.* The parties can condition the effectiveness or the dissolution of the contract, or of a single clause of the contract, upon a future and uncertain event.

- Italian Civil Code § 1359: *Fulfillment of condition.* A condition is considered fulfilled when it fails for

a cause imputable to the party who had an interest contrary to its fulfillment.

- **Italian Civil Code § 1360**: *Retroactivity of condition.* The effects of fulfillment of the condition retroact to the time when the contract was made, unless by the intention of the parties or the nature of the relationship the effects of the contract or of its dissolution should be referred to a different time.

- **Italian Civil Code § 1362**: *Intent of contracting parties*. That which was the common intent of the parties, not limited to the literal meaning of the words, shall be sought in interpreting the contract.

- **Italian Civil Code § 1363**: *Comprehensive interpretation of clauses*. Every clause of the contract is interpreted with reference to all the others, attributing to each the meaning resulting from the act as a whole.

- **Italian Civil Code § 1366**: *Interpretation according to good faith*. The contract shall be interpreted according to good faith.

- **Italian Civil Code § 1367**: *Preservation of contract*. In case of doubt, the contract or the individual clauses shall be interpreted in the sense in which they can have some effect, rather than in that according to which they would have none.

- **Italian Civil Code § 1369**: *Expressions with several possible meanings*. In case of doubt, expressions which can have more than one meaning shall be understood in the sense most suitable to the nature and object of the contract.

- **Italian Civil Code § 1370**: *Interpretation against author of provision*. Provisions contained in the standard conditions of a contract or in forms or formularies which have been prepared by one of the contracting parties, are interpreted, in case of doubt, in favor of the other.

**D.  Attorney Rocco Lamura's Expert Testimony Regarding Italian Separation Agreements**

In addition to the Italian Civil Code provisions set forth above, the court is also guided, in part, by the testimony offered by Petitioner's Italian law expert, Attorney Lamura, at trial.  According to Attorney Lamura, if a separation agreement authorizes a parent to leave Italy for another country with the children if specific conditions are satisfied and that agreement is subsequently "so ordered" or "ratified" by an Italian court, the authorized parent may leave Italy with the children without returning to court to obtain additional authorization if the specific conditions are satisfied. (Tr. 242:21-244:10.)  In other words, if a court-ratified separation agreement sets forth conditions triggering a parent's right to remove the children from Italy and to retain them in another country, the fulfillment of those conditions alone is sufficient to permit that parent to exercise his or her rights to remove the children from Italy and retain them in the other country. (*See* Tr. 244:1-10.)  Finally, Attorney Lamura testified that an Italian judge would be unlikely to approve or ratify an agreement that violates the Italian Civil Code, lending a presumption of enforceability and validity to a separation agreement so ordered by an Italian court. (*See* Tr. 244:11-18.)

## CONCLUSIONS OF LAW

The parties' post-trial briefing focuses heavily on
the interpretation and application of Paragraph O of the April
2011 Separation Agreement and its effect on this court's Hague
Convention analysis.  Therefore, the court begins with a
detailed discussion and interpretation of Paragraph O and
thereafter proceeds to evaluate Petitioner's *prima facie* case
and Respondent's affirmative defense under the Hague Convention
in light of Paragraph O.  Based upon a review of the evidentiary
record and guided by the relevant provisions of Italian law, the
court finds by a preponderance of the evidence that the
conditions of Paragraph O have been satisfied and that Paragraph
O authorized Respondent to remove the children from Italy and
thereafter retain the children in the United States.

**I.    Interpreting and Applying the Parties' Separation
Agreements and Paragraph O**

**A.    The Court's Interpretation of Paragraph O**

1.    *Whether the Court May Interpret and Apply
Paragraph O in the Context of the Parties'
Separation Agreements*

As a threshold matter, Petitioner, having commenced
this action and thereby invoked this court's jurisdiction to
determine whether the children were wrongfully removed from
Italy and retained in the United States under the Hague

Convention,[29] vigorously objects to the court's interpretation and application of Paragraph O of the April 2011 Separation Agreement. Specifically, Petitioner argues that the court's interpretation and application of that provision "violates the meaning and spirit of the terms of the Convention" because "interpretation of Provision 'O' requires the expertise of the Italian Court where this custody action still resides . . . ." (Pet. Post-Trial Mem. at 17.) Citing to no authority and without offering any explanation or analysis, Petitioner maintains that "[t]hese issues cannot be decided by a foreign Court, unfamiliar with applicable language and laws in a proceeding where the Petitioner is at a distinct disadvantage." (*Id.*) Petitioner, however, has failed to explain how the court's necessary interpretation and application of Paragraph O exceeds the bounds of the court's authority under the Hague Convention.

The court is well aware that it is "strictly prohibited from adjudicating the merits of the custody dispute," *Radu*, 805 F. Supp. 2d at 6 (citing *Poliero*, 2009 WL 2947193, at *9), and the court has no intention of doing so. The court also

---

[29] Notably, Petitioner, in his Hague Convention petition, alleged that Respondent's removal and retention of the children violated his custody rights under "the Italian Civil Code . . . and also the *Order of Separation issued by the Italian Court*." (Petition at 8 (emphasis added).) Thus, Petitioner's Hague Convention petition itself invites the application and interpretation of the April 2011 Separation Agreement, including Paragraph O.

recognizes that adjudicating the merits of the underlying custody dispute is not the court's function.  Rather, this court must decide whether the removal and retention were wrongful under the Hague Convention and, in doing so, must interpret the April 2011 Separation Agreement, including Paragraph O, under Italian law.  The court's interpretation and application of Paragraph O here are in furtherance of the jurisdictional determination regarding the Petitioner's contention that the children's removal and/or retention by the Respondent were wrongful under the Hague Convention and ICARA.  In making this determination, the court takes no position on the merits of the parties' underlying custody dispute.[30]

The Hague Convention itself recognizes that, in determining whether the removal or retention of a child is wrongful, the court must determine if the removal or retention is "in breach of rights of custody attributed to a person." Hague Convention, art. 3(a).  The "rights of custody" in Article 3(a) may arise by operation of law or by reason of judicial or administrative decision or by reason of an agreement having

---

[30] Moreover, the court notes that the parties appear to have already resolved any dispute as to their respective custody rights by entering into the September 2010 and April 2011 Separation Agreements, both of which were executed with the advice of counsel and thereafter ratified and so ordered by an Italian court.  Accordingly, far from adjudicating the merits of an underlying "custody dispute," the court here is merely applying Paragraph O of the court-approved April 2011 Separation Agreement, an agreement which determined the nature and scope of Petitioner's and Respondent's custody rights.

legal effect.  Thus, if the court finds that Italy was the habitual residence of the children immediately before their removal to and retention in the United States, the court-ordered Separation Agreements of September 2010 and April 2011 provide a basis for this court to determine whether Petitioner's rights of custody were breached by Respondent's removal and retention of the children.  Accordingly, the court interprets and applies the provisions of those Separation Agreements and further engages in an analysis of the history between the parties that resulted in the April 2011 Separation Agreement, including Paragraph O, to determine the habitual residence of the children and to determine whether Respondent violated Petitioner's custody rights.

Moreover, other courts in the Second Circuit have applied foreign contract and domestic relations law in interpreting parties' mutual agreements in Hague Convention cases.  For example, in *A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 629-39 (E.D.N.Y. 2012), *aff'd*, *Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012), Judge Weinstein, with subsequent approval by the Second Circuit, applied Mexican contract and domestic relations law in interpreting an oral agreement between the petitioner mother and respondent father but ultimately determined that the agreement was null and void because the conditions precedent to

the effectuation of the contract were rendered factually impossible. As such, Judge Weinstein concluded that the parties' conditional agreement did not authorize the father's retention of the child in the United States. *Id.* at 637-38. The court's interpretation and application of Paragraph O under Italian law is no different than Judge Weinstein's application of Mexican contract and domestic relations law in *A.A.M.*

Although the court is mindful of its limited expertise in Italian law, the court must fulfill its obligations under the Hague Convention, guided in part by the testimony of Italian Civil Code expert Attorney Lamura and by the clear principles set forth in the Italian Civil Code. Accordingly, the centrality of Paragraph O in resolving the instant Hague Convention action invites, and in fact demands, the court's interpretation and application of that contractual provision, undertakings for which this court has authority under the Hague Convention and ICARA.

> 2. *Whether the September 2010 and April 2011 Separation Agreements Constitute Contracts Under Italian Law*

The parties do not dispute that the September 2010 and April 2011 Separation Agreements, both ratified by an Italian judge, constitute valid and enforceable agreements under Italian law. Nor do the parties dispute that they are bound by the

provisions contained therein.  Moreover, a review of the

relevant Italian Civil Code provisions confirms that the

September 2010 and April 2011 Separation Agreements in fact

constitute valid and enforceable contracts under Italian law.

Under Italian law, "[a] contract is the agreement of two or more

parties to establish, regulate or extinguish a patrimonial legal

relationship among themselves." It. C.c. § 1321.  A contract is

"formed at the moment when he who made the offer has knowledge

of the acceptance of the other party." It. C.c. § 1326.

Respondent and Petitioner formed such agreements here with

respect to the September 2010 and April 2011 Separation

Agreements; in particular, the parties, represented by Italian

attorneys, knowingly and intelligently negotiated and entered

into mutual agreements whereby they delineated the terms and

conditions of their legal separation as husband and wife,

including custody of their children. (*See* Tr. 56:13-20.)

Italian civil law recognizes freedom of contract, as it is well-

settled that parties may "freely determine the contents of the

contract within the limits imposed by law." It. C.c. § 1322.

The parties have done so here with respect to their legal

separation.

Although consensual separation requires "confirmation

by the court" to be legally effective under Italian domestic

relations law, *see* It. C.c. § 158, Respondent and Petitioner obtained court ratifications of the September 2010 and April 2011 Separation Agreements, (Pet. Exh. 8, at 20; Resp. Exh. T, at 7-8.)  Importantly, as indicated by the expert testimony of Attorney Lamura, the Italian court's ratification of the separation agreement attaches a presumption of validity and enforceability under the Italian Civil Code, as it is unlikely that Italian judges would approve a consensual separation agreement that violated any provision of the Code, including those related to domestic relations and contract law. (*See* Tr. 244:11-18.)  Consequently, the court construes the September 2010 and April 2011 Separation Agreements as valid contracts under Italian law and therefore interprets the meaning of the provisions therein as binding and enforceable provisions of those contracts.

   3.   *The Meaning of Paragraph O of the April 2011
        Separation Agreement*

   With respect to the meaning of Paragraph O, Petitioner and Respondent unsurprisingly offer conflicting interpretations of the provision.  Petitioner maintains that Paragraph O contemplates satisfaction of the following three requirements before Respondent is authorized to return to the United States with the children: (1) Petitioner must fail to pay several

68

monthly rent installments resulting in a lawsuit OR must fail to deposit into Respondent's bank account four months of spousal and child support; (2) Respondent must be unable to support the children and herself and must not have any income of her own; and (3) Respondent must prove to Petitioner that she has found a job of her own. (*See* Pet. Post-Trial Mem. at 17-20.) Petitioner further argues that Respondent cannot have *any* income in Italy in order to satisfy the second condition because the language of Paragraph O stipulates that she be "unable, not having any type of income of her own." (*Id.* at 18.) Petitioner lastly contends that, even upon satisfaction of the three required conditions, Respondent must still seek authorization from Petitioner because the contractual language only indicates that he "is willing to authorize" Respondent's return with the children to the United States and thus provides no guaranteed right for her to leave Italy and return to the United States with the children. (*Id.* at 19.)

Respondent, however, counters that Paragraph O constitutes authorization by the Petitioner, ratified by the Italian court, for her to return to the United States with the children upon satisfaction of the following two conditions: (1)(a)Petitioner must fail to pay several installments of rent resulting in lawsuits against the Petitioner and Respondent, OR

(b)Petitioner must fail to pay at least four months of child and spousal support, and Respondent must be unable to support herself and the children as a consequence; and (2) Respondent must demonstrate that she has found a job of her own. (Resp. Post-Trial Mem. at 6-7.)  Respondent maintains that, based upon common sense, grammar, and logic, the requirement that Respondent be "unable to support herself" applies only to the circumstance in which Petitioner has failed to pay four months of spousal and child support and not to the alternative circumstance in which Petitioner has failed to pay his rental obligations. (*Id.* at 6-7, 9.)  Finally, Respondent contends that Paragraph O is a self-executing provision and that she need not obtain further additional authorization from Petitioner or go back to the Italian court before exercising her right to return to the United States with the children and remain there once the conditions of Paragraph O have been satisfied. (*Id.* at 12-15.)

Upon consideration of the relevant Italian Civil Code provisions, the plain language of the relevant contractual provisions contained in the April 2011 Separation Agreement, and the record evidence of the circumstances under which the parties superseded their September 2010 Separation Agreement with the April 2011 Separation Agreement which added Paragraph O, the court rejects Petitioner's overly convoluted and illogical

interpretation of Paragraph O.  The court finds that the interpretation offered by Respondent is reasonable and supported by the facts and the law.

First, the court agrees that the language of Paragraph O of the April 2011 Separation Agreement contemplates two separate contingencies under which the Petitioner and the Italian court authorized Respondent to exercise her right to return with the children to the United States.  Under the first contingency in Paragraph O, Petitioner and the Italian court authorized Respondent to return to the United States with the children (1) if Petitioner failed to pay several rent installments resulting in legal proceedings against the Petitioner and Respondent and (2) if Respondent could demonstrate that she found a job.  Under the second alternative contingency, Respondent was authorized to return to the United States with the children (1) if Petitioner failed to deposit into her account at least four months of spousal and child support; (2) if Respondent was without income that would enable her to support herself and the children in Italy in light of Petitioner's failure; and (3) if Respondent could demonstrate that she found a job.  The court thus agrees with Respondent that the condition requiring Respondent to be "unable to support herself" applies only to the circumstance in which Petitioner

fails to deposit four months of spousal and child support payments as required by the separation agreement. The structure and text of Paragraph O support this interpretation.

For example, the relevant language of Paragraph O states as follows: "In case of non-payment of several monthly rent installments by Mr. Pignoloni resulting in lawsuits on behalf of the owners / or of non-bank-deposit for at least four months of the support for the children and for the wife and should the wife be unable, not having any type of income of her own, to support and maintain the children and herself . . . ." (Resp. Exh. T, at 5.) Here, the language "and should the wife be unable . . . to support and maintain the children and herself" logically references the non-payment of "support for the children and for the wife," rather than the non-payment of rent. Indeed, the contractual language suggests that Respondent's inability to support herself and the children is tethered to Petitioner's failure to provide spousal and child support under the Separation Agreement. In Paragraph O, the requirement that Respondent be "unable . . . to support and maintain the children and herself" is conceptually connected to the condition that Petitioner failed to pay Respondent the support payments that would enable her to support and maintain the children and herself in Italy. Logic, and plain meaning,

therefore dictate that Respondent need only establish her

inability to support the family in the event that Petitioner has

failed to provide the support and maintenance payments that were

required and ordered to allow Respondent to support the children

and herself.  Additionally, Paragraph O contains a structural

break through the use of the backslash ("/"), suggesting that

the language following the backslash constitutes a separate and

isolated condition that, upon satisfaction, independently

triggers Respondent's authorized right of return to the United

States with the children, so long as she could demonstrate that

she found a job.  The backslash provides a visible separation

between two alternative contingencies in which Respondent may

return with her children to the United States.  Significantly,

the requirement that Respondent be unable to support herself

applies only to the second of those contingencies: Petitioner's

non-payment for four months of requisite spousal and child

support.[31]

Second, the court rejects Petitioner's contention that

Paragraph O is not satisfied if Respondent is able to have *any*

income of her own.  Although the court acknowledges that the

contractual language states that Respondent must "be unable, not

_____

[31] In any event, as explained in further detail below, all of the
conditions contained in Paragraph O came to pass.  Thus, even under
Petitioner's interpretation, Respondent was authorized to exercise her rights
under Paragraph O.

having any type of income of her own, to support and maintain the children and herself," (Resp. Exh. T, at 5), the court declines to interpret that clause as a total prohibition on Respondent's ability to engage in any income-producing activity if she intends to exercise her rights under Paragraph O. Such an interpretation would render superfluous the words "unable . . . to support and maintain the children and herself." If the Respondent were precluded from having any income at all, it would have been unnecessary to include the phrase "unable . . . to support and maintain the children and herself" into Paragraph O: if Respondent were unable to have any income of her own, she would necessarily be unable to support herself and two children. Rather, the lack of any income is related by the language and logic of the clause to Respondent's being "unable . . . to support and maintain the children and herself." Indeed, under Petitioner's view of Paragraph O, an annual income of € 1 would prevent Respondent from enforcing her rights under Paragraph O even though she undoubtedly would be unable to support and maintain herself and two children in Italy on € 1. The irrational result contemplated by Petitioner's construction could not have been intended by the contracting parties or the Italian court, and this court will not adopt an interpretation of Paragraph O that permits such a result. Rather, the court

interprets this condition as a requirement that Respondent establish her lack of income that would enable her to support and maintain the children and herself in Italy, given Petitioner's failure to provide the requisite spousal and child support payments for at least four months.

Additionally, Petitioner's interpretation of Paragraph O is incongruous with Paragraph L, which authorizes Respondent to travel to "New York or to the United States generally for work reasons and for certain periods of time limited to the execution of the work itself." (Resp. Exh. T, at 4.) The Italian Civil Code requires courts to interpret "[e]very clause of the contract . . . with reference to all the others, attributing to each the meaning resulting from the act as a whole." It. C.c. § 1363. Here, Paragraph L gives Respondent current authorization, contemporaneous to the date of execution of the April 2011 Separation Agreement, to travel for work and thereby earn income for the family, but simultaneously requires Petitioner to pay child support, spousal support, and rent under Paragraphs C, D, and F, respectively. Accordingly, Paragraph O should be reasonably interpreted to reflect the parties' intent – embodied in the neighboring provisions of the April 2011 Separation Agreement – that Respondent be able to earn income while receiving spousal and child support from Petitioner.

Guided by this intent, the court concludes that Paragraph O necessarily provides that if Petitioner failed to make four of the required monthly support payments, Petitioner authorized Respondent's return to the United States with the children if Respondent was unable to support herself and her children in Italy in the absence of Petitioner's complete support payments; Respondent is not required to prove that she earns absolutely nothing.

The court's interpretation is further reinforced by the Italian Civil Code's interpretive precept that the court endeavor to ascertain "the common intent of the parties, not limited to the literal meaning of the words . . . in interpreting the contract." It. C.c § 1362. Here, the parties entered into the April 2011 Separation Agreement in order to set forth the respective rights and obligations of the parties in light of their separation as husband and wife and in light of the reduction of spousal support payments from € 500 per month as prescribed by the September 2010 Separation Agreement to € 100 per month. Nowhere in the April 2011 Separation Agreement is there a shared intent to condition Respondent's return to the United States with her children upon her abject poverty or a complete inability to earn any income in Italy. Rather, Paragraph O embodied the parties' contingent authorization for

Respondent to return to the United States with the children provided that she found a job and that Petitioner failed to fulfill his support obligations leaving Respondent unable to support herself and her two children as a consequence of that failure, even considering the income she was able to earn.  In any event, Petitioner has failed to make any showing, by evidence or otherwise, that his interpretation of Paragraph O is reasonable or supported by the parties' common intent.

Third, the court agrees with Respondent that Paragraph O is a self-executing provision that grants Respondent the contingent authority to bring the children to the United States upon satisfaction of the enumerated conditions precedent.  The court is not persuaded by the Petitioner's unsubstantiated contention that the language – "is willing to authorize" – affords Respondent no guaranteed right of return to the United States absent explicit authorization from himself and/or an Italian court, even if the conditions of Paragraph O are met. At trial, Petitioner testified that his interpretation would render Paragraph O meaningless and that he and his Italian attorney in fact believed Paragraph O to be meaningless even though Respondent accepted an 80% reduction in her spousal support payments, from € 500 Euros in the September 2010 Agreement to € 100 Euros in the April 2011 Separation Agreement

in exchange for the inclusion of Paragraph O in the April 2011 Separation Agreement.[32] (Tr. 130:2-131:2; Pet. Exh. 8, at 15; Resp. Exh. T, at 3, 5.)  In Petitioner's view, Paragraph O did nothing to change his rights under the parties' initial September 2010 Separation Agreement and was merely a meaningless clause added at the request of Respondent.  The court fully credits the Respondent's testimony that she perceived the clause to be an important "safety net" in the event of Petitioner's failure to provide spousal and child support, particularly in light of the 80% reduction in her support payments. (*See* Tr. 279:14-280:11.)

Moreover, Petitioner's interpretation is unavailing for numerous reasons.  First, the court rejects outright any interpretation of Paragraph O that renders it meaningless. Under Italian law, contractual provisions "shall be interpreted in the sense in which they can have some effect, rather than in that according to which they would have none." It. C.c. § 1367. As such, the court refuses to adopt Petitioner's interpretation of Paragraph O as an empty, equivocal, and meaningless provision that would require Respondent to obtain an Italian court's authorization or Petitioner's consent prior to exercising her

---

[32] The court rejects, as it must, Petitioner's testimony as to what his attorney believed.

rights under Paragraph O.  Furthermore, the court finds
Petitioner's testimony that he thought Paragraph O was
meaningless and without effect to be self-serving, unreliable,
not credible, and inconsistent with his other testimony at
trial.  After testifying that he thought Paragraph O was
meaningless, Petitioner acknowledged that the reason Paragraph O
was added to the April 2011 Separation Agreement was because, as
a result of "negotiations" between Petitioner and Respondent,
"[Respondent] accepted that [Petitioner] would give her less
money, but she want[ed] to have [Paragraph O] added to the
document." (Tr. 130:7-10.)  Second, the Italian Civil Code
requires courts to interpret contracts "according to good
faith." It. C.c. § 1366.  Petitioner's attempt to interpret
Paragraph O into a nullity is far from a good faith construction
of the contractual provision.  Rather, a good faith reading of
Paragraph O requires that it have meaning, especially in light
of Respondent's willingness to receive € 400 less in monthly
support payments in exchange for the inclusion of Paragraph O in
the April 2011 Separation Agreement. (Tr. 130:2-131:2.)

        Additionally, contrary to Petitioner's forced
interpretation of Paragraph O, the plain meaning of the
contractual language – "is willing to authorize" – denotes
Petitioner's present intention to authorize Respondent's return

79

to the United States upon the fulfillment of specified contingent future conditions precedent. Petitioner, however, contends that both Paragraph C, which requires his consent in order for Respondent to travel with the children outside of Italy for vacation, and Paragraph L, which " authorizes temporary transfers of [Respondent] to New York . . . for work reasons," indicate that Paragraph O provides no authorization to leave the country with the children absent Petitioner's consent. (Pet. Post-Trial Mem. at 18.) In Petitioner's view, he could have given, but purposefully chose to withhold, specific and unambiguous authorization for Respondent to return to the United States, as he provided in Paragraph L of the separation agreement; instead, Petitioner claims that Paragraph O constitutes mere equivocation regarding Respondent's rights to return to the United States, even upon the fulfillment of Paragraph O's prerequisites caused by Petitioner's own failings.

The court is not persuaded by Petitioner's argument. Unlike Paragraph O, Paragraph L is not contingent upon the fulfillment of future conditions precedent. Instead, Paragraph L provides contemporaneous authorization for "temporary transfers" of Respondent to New York for work or job interviews, activities that were, according to the trial evidence, occurring during the formation of the April 2011 Separation Agreement. As

such, there was no need in Paragraph L to include language of Petitioner's intent to provide future authorization for Respondent's return to New York with the children. By contrast, Paragraph O is by its terms effective only upon the satisfaction of possible future and contingent conditions that had not yet, or may never have, been fulfilled during the drafting, execution, and judicial ratification of the agreement: namely, lawsuits by the landlord of the home in which Respondent and the children resided, resulting from Petitioner's non-payment of rent installments, or four months of delinquent child or spousal support obligations resulting in Respondent's inability to support herself and the children in Italy. Italian law contemplates such conditional contract clauses and permits parties to "condition the effectiveness or the dissolution of [a] contract, or of a single clause of [a] contract, upon a future and uncertain event." It. C.c. § 1353. Paragraph O constitutes a conditional contractual provision, the effectiveness of which is triggered by the fulfillment of future conditions precedent, as recognized by Italian law.

Accordingly, based on facts in the record, the court's credibility determinations, and the logical interpretation of the language used, the court finds that the term, "is willing to authorize" states the parties' mutual agreement, embodied in the

April 2011 Separation Agreement, that Petitioner had the present intention to authorize Respondent's return to the United States if the specified, yet uncertain contingent future conditions set forth in Paragraph O were satisfied. Such an interpretation comports with a good faith reading of the contract's plain language and with the well-settled principles of contract interpretation under Italian law.

Fourth, Petitioner argues that, under Paragraph O, Respondent must prove to Petitioner that she had a job prior to her removal or retention of the children in the United States. (*See* Pet. Post-Trial Mem. at 18.) This argument is unavailing. First and foremost, the contractual language contains no explicit requirement that Respondent prove her employment to any specific person, much less the Petitioner, nor does the provision prescribe a precise time that Respondent must prove her employment. Specifically, the relevant contractual language – "provided that the wife proves that she has found a job of her own" – does not clearly identify the individual or entity to whom she must make such proof, or when she must do so. (*See* Resp. Exh. T, at 5.) Paragraph O contains no specific timeframe nor does the provision define the type or level of "proof"

Respondent was required to make.[33]  The court will not impose

specific additional requirements not contemplated by the

language of the contract.  Under the plain language of Paragraph

O, Respondent need only prove, i.e., establish, that she has

found a job, and nothing more.  Under Petitioner's

interpretation of Paragraph O, Respondent would be required to

make a showing to Petitioner's satisfaction that she has a job

before exercising her rights under Paragraph O.  The court finds

Petitioner's interpretation untenable and declines to adopt it.

In any event, Petitioner was always aware that

Respondent had been and was at the time a freelance designer for

Polo and other fashion companies before her departure from

Italy.  In fact, Petitioner testified that he knew when

Respondent was working on projects for these companies during

2011 because he would take care of the children when Respondent

was required to travel for work. (*See* Tr. 86:2-9.)  Petitioner

also testified that, between September 2011 and March 2012,

Respondent "worked freelance" and "had projects all during this

time period." (Tr. 154:22-155:22.)  Petitioner was also aware

---

[33] Moreover, even if Paragraph O requires Respondent to prove to Petitioner that she found a job before exercising her right to relocate to the United States with the children, the provision does not specify the amount of time before Respondent's departure from Italy that she had to make such a showing.  For example, Paragraph O does not say that "immediately before her departure from Italy," Respondent must prove she has found a job of her own.  Thus, Petitioner's interpretation, at best, leads to an incomplete, ambiguous, and unprincipled requirement, which the court will not read into the contract.

that Respondent was, at all times, the owner and operator of her own company, Spec Tech Direct.  Thus, even under Petitioner's unsupported interpretation of Paragraph O, whereby Respondent had to prove *to Petitioner* that she had found a job before she exercised her rights under Paragraph O, that condition would have been met because Petitioner knew that Respondent was a contract worker for various design companies and the owner of her own company. Put simply, Petitioner concedes that he had long been aware that Respondent had freelance jobs of her own.

In further support of his view that Paragraph O should be rendered meaningless, Petitioner argues that even if Paragraph O authorizes the "return" of Respondent and the children to the United States, the provision does not authorize them to stay permanently in the United States. (Pet. Post-Trial Mem. at 19.)  Once again, Petitioner provides no support for his strained interpretation of the word "return," which would render Paragraph O superfluous and obsolete.  Paragraph C and Paragraph L already address the terms under which Respondent may travel temporarily to the United States for vacation with the children and for work, respectively. (Resp. Exh. T, at 2, 4.)  Paragraph O, on the other hand, directs itself towards Respondent's permanent relocation with the children, by returning to the United States, the birth country of Respondent and the eldest

child.  Additionally, given the lack of any time limits imposed upon Respondent's "return" under Paragraph O, Petitioner has failed to offer any principled method of determining those time limits.  Thus, the court interprets the word "return"[34] to authorize Respondent both to remove the children to the United States from Italy as well as to retain the children in the United States, provided that the conditions of Paragraph O are satisfied.  This interpretation is supported by the plain meaning of Paragraph O's language, the other provisions of the April 2011 Separation Agreement, and the principles of contract interpretation under Italian law.

### B.  The Court's Application of Paragraph O

Applying Paragraph O according to the interpretation set forth above, the court concludes that the conditions of Paragraph O have been met and that Respondent was therefore authorized to remove the children from Italy and to return with them to the United States.  As noted previously, the court's application of Paragraph O is necessary to determine the habitual residence of the children and to resolve whether

---

[34] The court's interpretation is consistent with the definition of "return": "to go back or come back again <*return* home>" or "to bring, send, or put back to a former or proper place." *Return Definition*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/return (last visited Nov. 25, 2012). That definition supports the court's determination that Paragraph O authorized Respondent to "go back" to her former residence, New York, with the children and remain there with them. (*See* Resp. Exh. T, at 5.)

Respondent's removal and retention of the children was wrongful under the Hague Convention.

1.  *Respondent's Proof That She Has Found a Job*

To exercise her rights under Paragraph O, Respondent must "prove that she has found a job of her own." (Resp. Exh. T, at 5.)  As explained above, Paragraph O provides no concrete definition for or limitation on the word, "job," nor does the provision contemplate specific requirements for when Respondent must obtain a job and to whom she must prove that she has found such a job.  Rather, the plain language of Paragraph O simply requires Respondent to prove that she has a job, and nothing more.  Upon review of the record, the court finds that Respondent has made an adequate showing that she currently has, and has always had, a job as a freelance technical designer for various fashion companies such as Polo and Belstaff. (*See generally* Pet. Exhs. 37-39.)

Respondent has worked as a freelance independent contractor for Polo since before the time of her marriage to Petitioner in June 2005, and even after her relocation to Italy. (Tr. 29:11-30:13, 262:11-21, 269:19-270:4.)  Between 2006 and the present day, Respondent has maintained a freelance employment relationship with Polo, albeit ad hoc and informal at times, and has completed various projects in New York and Italy.

(Tr. 29:7-22, 269:19-270:4, 283:25-284:5, 358:22-359:15, 382:5-16, 486:25-487:13; Pet. Exh. 33, at 15.)  Although Respondent took a hiatus from her work in 2008 during her pregnancy with A.T.P., (*see* Tr. 29:11-30:18), and again between September 2010 and May 2011 to care for A.T.P. after his diagnosis with degenerative muscular dystrophy, (Tr. 49:5-15), Respondent has always maintained a freelance "job" with Polo and other companies, even though those jobs did not constitute permanent employment with any one company.  In the weeks leading up to her April 24, 2012 departure from Italy, Respondent undertook a project with Polo in Milan, although she was not working on a specific project on April 24, 2012.[35] (Tr. 382:5-16; Pet. Exh. 33, at 15.)  Additionally, Respondent credibly testified that, in June 2012, she was asked by Polo to engage in a long-term project lasting at least through the summer but was awaiting approval from Polo's Finance Department. (Tr. 491:14-25.) Although that project ultimately fell through, Respondent had a reasonable expectation, when she formed the intention to remain in the United States with the children in or around approximately June 24, 2012, that she successfully obtained a job. (*See* Resp. Exh. U, at 1; Tr. 491:7-492:6.)  Additionally,

---

[35] As established by evidence in the record, Respondent's "job" was freelance design work for Polo and other fashion design companies.  As with many jobs involving freelance contract work, one's workflow may change depending on the needs of the companies with whom one works.

Respondent indicated that around June 24, 2012, she was working on a pattern-making project in another Polo department, demonstrating that Respondent was working when she decided to retain the children in the United States. (Tr. 492:3-14.) Thereafter, Respondent secured another work project between July 8th and July 26th working 35 to 40 hours for Polo. (Tr. 494:4-21.) Specifically, according to a July 26, 2012 letter written by a Polo Vice-President, Respondent was working 35 to 40 hours as a design consultant, and "it [was] anticipated that she [would] continue to do so for the foreseeable future." (Resp. Exh. K, at 1.) Most recently, since August, 21, 2012, Respondent has been working as a technical designer for the sweater department at Polo with full-time hours, during another employee's maternity leave, and will continue to do so until January 2013. (Tr. 495:4-21.)

The record evidence, including Respondent's credible testimony regarding the need to increase her work in an attempt to support herself and her children, establishes that Respondent has sufficiently proven that, except for the periods previously noted for Respondent's pregnancy and care of her child, she had a job at all times prior to her removal and retention of the children. Respondent has continued to possess her job as a freelance designer for Polo and other fashion companies.

Moreover, Petitioner testified that he knew that between September 2011 and March 2012, Petitioner was working continually. (Tr. 154:22-155:22.) Thus, Respondent has satisfied the condition precedent in Paragraph O that she has "prove[n] that she has found a job of her own." (Resp. Exh. T, at 5.)

2. *Petitioner's Non-Payment of Rent*

In addition to proving that she has found a job, Respondent may exercise her rights under Paragraph O if the Petitioner fails to pay several monthly rent installments resulting in lawsuits against Respondent and Petitioner. (Resp. Exh. T, at 5.) Paragraph F of both the September 2010 and April 2011 Separation Agreements required Petitioner to pay the rent for the Via Minucia apartment in which Respondent resided with the children after Petitioner moved out. (Pet. Exh. 8, at 15; Resp. Exh. T, at 3.) The record demonstrates that Petitioner routinely failed to pay the required rent on the Via Minucia apartment on numerous occasions between 2006 and November 2011 and that the owners of the apartment thereafter commenced an eviction proceeding in Italian court seeking payment of those rental arrears and the eviction of Respondent and the children. (Tr. 158:4-10; Resp. Exh. G, at 2-4.) In fact, the record demonstrates that between the months of January and November

2011, Petitioner failed to pay approximately € 5,180 in rental obligations. (Resp. Exh. G, at 3.)  Moreover, by December 15, 2011, as a consequence of Petitioner's delinquent rent payments, the total arrearage on the apartment in which Respondent and the children resided was € 9,147.42. (*Id.*)

In an attempt to justify his repeated failure to fulfill his obligations to pay rent under the Via Minucia lease agreement and the Separation Agreements, Petitioner testified at trial that his efforts to eliminate the humidity and mold from the Via Minucia apartment along with Petitioner's other repairs to the property satisfied his rental obligations. (*See* Tr. 87:6-24, 90:10-93:14.)  Petitioner's testimony, however, is unavailing.  The Via Minucia Lease explicitly indicates that "the payment of the rent fee and of whatever else is due including additional charges may not be suspended or delayed by the Lessee with claims or exceptions, whatever the reason may be," and provides that "non-punctual payment of the rent installment . . . in the amount of two monthly rent payments is a serious breach of this contract." (Pet. Exh. 44, at 4.)  The Lease contains no provision authorizing the payment of rent in the form of tenant repairs; instead, the Lease clearly provides that rental payments cannot be suspended for any reason. (*See id.*)

Equally unavailing is Petitioner's reliance upon Italian Civil Code §§ 1575-77, which impose duties on the landlord to make all necessary repairs and to reimburse the tenant for necessary repairs undertaken by the tenant. When asked to identify any provision in the Lease or the Italian Civil Code that permits a tenant to make necessary repairs in lieu of timely rental payments, counsel for Petitioner was unable to point to any provision in the Lease or Italian Civil Code supporting Petitioner's assertion. (Tr. 92:17-93:9.) Petitioner's completion of undocumented and uncorroborated repairs on the Via Minucia apartment did not suspend or discharge his continuing obligation to pay rent for Respondent and the children's apartment as required in the Lease and the Separation Agreements.

Petitioner further contends that the conditions of Paragraph O were not satisfied because even if he failed to pay rent on the Via Minucia apartment, thus causing the commencement of eviction proceedings, he did not fail to pay rent on the new apartment to which Respondent and the children moved, just three weeks prior to their departure from Italy in late April 2012. (Pet. Post-Trial Mem. at 19.) The crux of Petitioner's argument is that the condition in Paragraph O requiring Petitioner's nonpayment of rent installments only applies to the residence in

which Respondent was living immediately prior to her departure from Italy. The court is unconvinced by Petitioner's attempt yet again to add a temporal requirement into the contractual language of Paragraph O where one does not exist. Petitioner signed a new lease for a new apartment on February 28, 2012 and, according to his testimony, paid rent in advance for the months of April, May, and June 2012.[36] (Tr. 99:5-9.) Respondent and the children, however, did not move into the new apartment until the last week of March 2012 and resided there for approximately three weeks prior to their departure from Italy. (Tr. 97:16-98:1.) The court rejects Petitioner's untenable contention that Respondent's rights based on Petitioner's failure to pay rent under Paragraph O were rendered void because three weeks earlier, Respondent and the children moved to an apartment for which Petitioner purportedly had prepaid three months of rent, immediately after having been subject to eviction from an apartment where Petitioner consistently failed to satisfy his rental obligations for almost eighteen consecutive months. (Tr. 281:1-11; *see generally* Resp. Exh. G.) Petitioner's interpretation, taken to its logical conclusion, would demand that if Respondent had moved into a paid apartment a day before

---

[36] There is no evidence in the record that Respondent was aware of the pre-payment of three months' rent, and Petitioner provides no proof that he actually made such payments.

her departure, this condition of Paragraph O could not be satisfied. Petitioner's interpretation is rejected.

Paragraph O contains no requirement that Petitioner fail to pay rent installments on the apartment in which Respondent resided immediately prior to her relocation to the United States. Thus, Petitioner's purported prepayment of the rent of the apartment to which Respondent and the children moved after the commencement of a lawsuit by the landlord of the Via Minucia apartment does not vitiate months, if not years, of rental arrears, nor does it vitiate Respondent's rights under Paragraph O once the condition concerning Petitioner's nonpayment of rent had been met already. Additionally, Respondent's living in her new apartment for a short time of approximately three weeks does not extinguish her rights under Paragraph O. Here, Petitioner failed to pay the rent on the Via Minucia apartment as required by the April 2011 Separation Agreement, and that failure resulted in an eviction proceeding. Subsequent actions taken by Petitioner or Respondent with respect to any new apartment do not change that fact. Accordingly, the court finds that Petitioner's routine failure to comply with his rental obligations as to the Via Minucia apartment and the resulting eviction proceeding by the landlord fulfilled the condition precedent required under Paragraph O as

93

early as January 2012 upon commencement of the eviction
proceedings.

Thus far, the record demonstrates that Respondent has
proven that she found a job and that Petitioner habitually
failed to pay rent on the Via Minucia apartment resulting in an
eviction proceeding commenced against the parties.  Accordingly,
the conditions necessary to trigger Respondent's rights under
Paragraph O have been satisfied, and Respondent was authorized
to return to the United States with her children, as provided in
the April 2011 Separation Agreement between the parties and
ratified by the Italian court.  Although this alone suffices to
permit Respondent's exercise of her rights under Paragraph O,
the remaining two conditions of Paragraph O have also been met
for the reasons that follow.

> 3. *Petitioner's Non-Payment of Spousal and Child
> Support and Respondent's Inability To Support
> Herself in Italy*

Petitioner's non-payment of at least four months of
spousal and child support and Respondent's attendant inability
to support herself and her children in Italy serves as an
alternative condition precedent to Respondent's exercise of her
rights under Paragraph O.  The court finds that, based on the
overwhelming evidence in the record, this condition has been
satisfied by Petitioner's failure to pay the requisite monthly

support payments for eight consecutive months and by Respondent's inability to support herself and her children in Italy in light of Petitioner's failure.

### a. Petitioner's Failure to Pay Spousal and Child Support

The record evidence demonstrates that Petitioner habitually failed to satisfy his spousal and child support obligations under the April 2011 Separation Agreement. Indeed, Petitioner conceded that between September 2011 and April 2012, he failed to deposit the required monthly spousal and child support payments of € 500 into Respondent's account, as required by the April 2011 Separation Agreement. (Tr. 68:8-12, 161:7-11.) The evidence in the record further confirms that Petitioner did not comply with the support obligations set forth in the April 2011 Separation Agreement. Specifically, with regard to his support obligations, Petitioner failed to pay € 50 in September 2011; € 300 in October 2011; € 400 in November 2011; € 500 in December 2011; € 500 in January 2012; € 250 in February 2012; € 350 in March 2012; and € 200 in April 2012. (Pet. Exh. 26, at 1-4; Tr. 162:13-24.) Petitioner's eight-month delinquency thus resulted in a total amount of € 2,550 of unpaid child and spousal support between September 2011 and April 2012. (*See* Tr. 162:13-24.) Accordingly, Petitioner's considerable failure to

comply with his support obligations for eight consecutive months doubly satisfies the condition that he fail to deposit into Respondent's bank account four months of spousal and child support payments.

That Petitioner intermittently paid for food and other expenses for the children between September 2011 and March 2012 does not alter the court's analysis. (Tr. 65:17-19, 68:17-24.) Although Petitioner testified that he believed that he could deduct amounts he paid for expenses from the required support payments, Paragraphs D and E of the April 2011 Separation Agreement require that Petitioner pay monthly child and spousal support payments to Respondent through direct bank deposits and transfers into Respondent's account, within the first five days of every month, and not through alternative payments by other means. (Resp. Exh. T, at 2-3.) Additionally, Paragraph O sets forth the support-related non-payment condition as follows: "In case of . . . *non-bank-deposit* for at least four months of the support for the children and for the wife." (Resp. Exh. T, at 5 (emphasis added).) Thus, all of the provisions in the April 2011 Separation Agreement related to child and spousal support contemplate payment in the form of direct bank deposits to Respondent within the first five days of each month and provide no alternative authorization for payment of food or other

expenses in lieu of those bank payments.  Thus, Petitioner's sporadic payments of food and other expenses for the children do not excuse his failure to pay the requisite monthly support payment of € 500 under Paragraphs D, E, and O, or abrogate Respondent's authorized return to the United States with the children.

> b. Respondent's Inability to Support Herself

As explained at length above, the additional prerequisite that Respondent be unable to support herself and her children applies only to the contingency in which Petitioner fails to pay four months of spousal and child support.  After careful consideration of the record evidence regarding Respondent's estimated expenses and income, the court finds by a preponderance of the evidence that Respondent was unable to support herself and her children in Italy in light of Petitioner's routine failure to pay the spousal and child

support required under the April 2011 Separation Agreement.[37]

Regarding living expenses, as enumerated in Paragraphs D, E, and F of the April 2011 Separation Agreement and as provided in the testimony and evidence adduced at trial, the court notes the following estimated annual expenses for Respondent and the children:

| Expense Type | Estimated Annual Costs |
|---|---|
| Education | € 1,200 |
| Medications | € 360 |
| Children's Extracurricular Activities & Entertainment | € 70 (Swimming) € 2,400 (Entertainment) |
| Airline Tickets | € 3,500 |
| Light/Electricity | € 567.72 |
| Home Telephone and Internet | € 960 |
| Respondent's Cell Phone | € 1,650 |
| Waste Disposal | € 225 |
| Heating | € 1,500 |
| Water | € 300 |
| Cable Television | € 348 |
| Automobile Insurance | € 2,600 |
| Automobile Maintenance | € 450 |
| Automobile Tax | € 125 |
| Gas | € 1,800 |

[37] The evidence in the record demonstrates that between January 2012 and April 24, 2012, Respondent made approximately $13,740 in income from projects with Belstaff and Polo. (Tr. 376:21-378:10; Pet. Exh. 38, at 9-10; Pet. Exh. 37, at 19.)  That number, however, does not provide a complete picture of income earned by Respondent in a year and does not accurately reflect Respondent's ability to support and maintain herself and her children in Italy, given her unique employment arrangement with Polo and other companies.  Moreover, as Respondent credibly testified, her income increased at the end of 2011 because she was looking for more work in light of Petitioner's failure to pay rent for eighteen months. (Tr. 281:1-11.) Accordingly, the court will use Respondent's income and estimated expenses in 2011 to determine whether she was able to support herself and her children in Italy, in light of Petitioner's failure to pay spousal and child support. The court finds that this methodology provides the most accurate, reliable, and comprehensive measure of Respondent's capacity to support herself and her children in the year leading up to her departure from Italy, a period which coincides with Petitioner's failure to pay the child and spousal support required by the April 2011 Separation Agreement.

| Food & Sundries | € 5,400 |
|---|---|
| Children's Clothing | € 3,000 |
| **Total** | **€ 26,455.72 or $32,408.26**[38] |

Absent from the foregoing calculation are significant expenses associated with rent (€ 5,400 per year for the Via Minucia apartment and € 7,200 per year for the new apartment); childcare (€ 900-1,000 per month for full weekly coverage); attorney and interpreter fees and expenses (€ 7,000-8,000 per year); entertainment for Respondent (not provided); and the substantial debt Respondent incurred on credit cards (as much as $12,000) partially as a result of using her credit cards for living expenses that she otherwise could have paid but for Petitioner's delinquent support payments.[39]

With respect to Respondent's personal income, her most recent income tax return from 2011 shows after-tax income of $12,839.11 from Polo.[40] (Resp. Exh. I, at 3.) Respondent also earned € 2,500 ($3,062.50) from Frankie & Ava, an amount not reflected on her 2011 United States income tax return as it was earned in Europe and deposited into her Italian bank account. (Tr. 318:15-319:2; Pet. Exh. 39, at 1-3.) Thus, in total,

---

[38] The parties agreed to a Euros-to-U.S. Dollar exchange rate of 1.2 to 1.25. (Tr. 429:1-4.) The court uses the average of that range, 1.225, in its conversion of Euros to Dollars.

[39] These expenses also do not include the € 5,000 that Respondent contributed to finance the home in which Petitioner currently lives and that Petitioner never returned to Respondent. (Tr. 132:12-25, 136:18-137:11.)

[40] The court finds that this tax return represents an accurate statement of Respondent's income from Polo for 2011.

Respondent appears to have earned $15,901.61 in personal income during 2011, far below the $32,408.26 in estimated yearly expenses in Italy itemized above.

The record indicates that, in 2011, Petitioner's partial payments of his spousal and child support obligations under the September 2010 and April 2011 Separation Agreements amounted to approximately € 6,350, or $7,778.75.[41] (Tr. 278:9-12, 281:22-24; Pet. Exh. 26, at 1-4.) Combining Respondent's 2011 income ($15,901.61) with Petitioner's deficient spousal and child support payments ($7,778.75) would yield $23,680.36, a total amount that is still short of the $32,408.26 in Respondent's estimated expenses to support and maintain herself and her children.

Although Respondent's company reported gross income of $13,507 in 2011, which included income earned from projects with Polo and Belstaff, Respondent's company had taxable income of zero because of significant operating losses from previous years. (Tr. 285:12-286:6; Resp. Exh. S, at 1, 6.) In fact, Respondent testified that between 2004 and 2010, Spec Tech Direct reported net losses of approximately $19,497. (Tr. 320:1-321:17.) The court therefore declines to include the reported

---

[41] The court briefly notes that Respondent's exercise of her right to return to the United States with the children pursuant to Paragraph O does not appear to relieve Petitioner of his spousal and child support obligations under the April 2011 Separation Agreement.

corporate income of $13,507 as part of Respondent's income for 2011 given that Respondent would unlikely have been able to use such income to support herself and her children in Italy.[42]

Respondent's credible testimony at trial further supports the court's finding that Respondent was unable to support and maintain herself and her children in Italy as a result of Petitioner's failure to fulfill his spousal and child support obligations between September 2011 and April 2012. Respondent testified that from April 2011 to the end of 2011, her income was not sufficient to cover her expenses because her freelance work was not a permanent job and she would often have to wait between paychecks. (Tr. 287:8-21.) As corroborated by evidence in the record, Respondent further credibly testified that between September 2011 and April 2012, she could not have paid for her and the children's expenses as well as the rent. (Tr. 289:5-21.) Moreover, during this period, to the extent that Respondent tried to cover the living expenses for herself

---

[42] If the court included Respondent's 2011 after-tax corporate earnings from Spec Tech Direct ($13,507) with her 2011 after-tax personal income ($15,901.61) and Petitioner's partial payments of spousal and child support ($7,778.75), the resulting amount, $37,187.36, would be greater than the $32,408.26 in the estimated expenses enumerated above. These expenses, however, do not include rent expenses, significant childcare expenses, attorney and interpreter expenses, personal entertainment expenses, and Respondent's burgeoning credit card debt. Taken together, all of these expenses would have rendered Respondent unable to support and maintain herself and her children in Italy even accounting for her corporate income and Petitioner's deficient child and spousal support payments in 2011. Indeed, Respondent credibly testified that she was unable to support herself and her children with the amount of money that she received from Petitioner and earned through her freelance work. (*See* Tr. 287:8-21.)

and her children in the wake of Petitioner's ongoing failure to
pay support, the record demonstrates that doing so required her
to take on significant credit card debt, deplete her minimal
personal savings, and travel around the world away from her
children for long periods of time to complete her freelance
design work. (Tr. 271:2-7, 272:16-21, 289:22-24.)  Thus, beyond
the numerical calculations based on the evidence as set forth
above, the court's conclusion that Respondent was unable to
support herself and her children in Italy is supported by
Respondent's credible testimony that Petitioner's failure to
provide spousal and child support had a crippling and dire
impact on her finances.

Having found that all of the conditions of Paragraph O
have been satisfied, the court now proceeds to determine whether
Respondent's removal and retention of the children were wrongful
in light of Paragraph O's authorization of her return to the
United States with the children.  The Hague Convention prohibits
both wrongful removal and wrongful retention, either of which
provides grounds for the return of the children to their country
of habitual residence. *See* Hague Convention, art. 1(a).  Thus,
Respondent's removal of the children from Italy on April 24,
2012 constitutes a separate and independent act from
Respondent's later decision to retain the children in the United

States in late June 2012.  Accordingly, the court analyzes
separately whether Respondent's removal of the children from
Italy was wrongful and whether Respondent's subsequent retention
of the children in the United States was wrongful.

## III. Respondent's April 24, 2012 Removal of the Children from Italy

Paragraph O authorizes Respondent to remove her
children from Italy and remain with them in the United States.
Once the conditions precedent to Paragraph O came to pass,
Respondent's rights under Paragraph O were triggered, thereby
permitting her to travel to the United States with her children
and to stay there with them permanently.  At its core, Paragraph
O constitutes a binding provision in the court-ratified April
2011 Separation Agreement that sets forth the potential future
circumstances under which Petitioner granted his authorization
and consent to Respondent's removal of the children and their
relocation to the United States.  Although Respondent had not
made the decision to retain the children and remain in the
United States until late June 2012, she was well within her
rights to remove the children and travel to the United States on
April 24, 2012 under Paragraph O.

### A.  Habitual Residence

In determining the habitual residence of the children

at the time of their removal from Italy on April 24, 2012, the court must first ascertain the last shared intention of Respondent and Petitioner and thereafter inquire upon the children's acclimatization to the United States. *See Gitter*, 396 F.3d at 134. As the Second Circuit observed, where, as here, "the parents have come to disagree as to the place of the child's habitual residence," the court must "determine the intentions of the parents as of the last time that their intentions were shared." *Id.* at 133. Although Paragraph O authorized Respondent's removal of the children as of the time the contingent conditions were satisfied by Petitioner's failures under the April 2011 Separation Agreement, the court finds that immediately before the removal in April 2012, the children's habitual residence was Italy.

Since their births, the children have lived primarily in Italy and have interacted frequently with their Italian aunts and uncles, cousins, and grandmother in Ascoli Piceno. (Tr. 45:7-24.) Both children have attended school in Italy and speak Italian as their primary language. (Tr. 63:15-16, 104:10-15.) The record indicates, and the parties do not dispute, that up until April 2011, Respondent and Petitioner shared a mutual intent for the children to reside in Italy and that the children were acclimatized to no other country but Italy. On April 29,

2011, however, the parties entered into a binding separation
agreement in which they formalized their shared intent to reduce
Petitioner's support payments to Respondent by 80% and to permit
Respondent to relocate the children to the United States upon
the satisfaction of certain conditions precedent. (Tr. 49:21-24;
Resp. Exh. T.)  Thus, once those conditions were satisfied,
Respondent was authorized to move the habitual residence of her
children from Italy to the United States without further
requesting or again obtaining Petitioner's permission.  By
entering into the agreement, which was approved by the Italian
court, Petitioner authorized Respondent to exercise her right to
change the children's habitual residence, but conditioned that
right on his failure to pay rent or child support and her
finding a job.  Nevertheless, the April 2011 Separation
Agreement did not, by its existence, alter the habitual
residence of the children to the United States at the moment
that the parties executed that agreement; rather, it merely
created Respondent's contingent right to change the children's
habitual residence in the future upon fulfillment of certain
conditions should she wish to do so.

    According to her own testimony, Respondent had not yet
decided to permanently relocate the children from Italy to the
United States on the date of her departure from Italy on April

24, 2012. (Tr. 294:9-15.) Indeed, Respondent and the children had return tickets to the Italy in May 2012, and initially went to the United States as part of a planned visit to attend a party for Respondent's godson. (Tr. 396:14-21, 403:17-23, 422:23-25.) Because Respondent planned on returning to Ascoli Piceno, she left most of the children's belongings and her own belongings in Italy. (Tr. 403:23-404:11.) Accordingly, the record demonstrates that, immediately before Respondent's removal of the children from Italy, Respondent and Petitioner shared a mutual intent that the children's habitual residence was Italy.

The Second Circuit's reasoning in *Poliero v. Centenaro*, 373 F. App'x 102 (2d Cir. 2010) (summary order) supports this finding. In *Poliero*, the Second Circuit determined that there was no settled intention to abandon Italy as the children's habitual residence because the parties did not attempt to sell the family home, maintained personal belongings in Italy, and purchased airplane tickets to return to Italy. 373 F. App'x at 105. Like the respondent in *Poliero*, Respondent here demonstrated that immediately before the removal of the children from Italy on April 24, 2012, her intent, which Petitioner shared, was to retain Italy as the habitual residence of the children by leaving her belongings in Ascoli Piceno and

purchasing return tickets to Italy.

Although Respondent could have exercised her right under Paragraph O to change the children's habitual residence to the United States, Respondent did not do so prior to, or at the time of, her trip with the children to New York in April 2012. Consequently, the children's habitual residence at the time of their removal was Italy.

**B. Whether Respondent Violated Petitioner's Exercised Custody Rights**

The court must also determine whether Respondent's removal of the children from Italy violated Petitioner's custody rights under Italian law and, if so, whether Petitioner was exercising those rights at the time of the removal. *See Norden-Powers*, 125 F. Supp. 2d at 638 (citing Hague Convention, art. 3). Upon review of the record, and in light of Respondent's authorization to remove the children under Paragraph O of the April 2011 Separation Agreement, the court finds that the preponderance of the evidence demonstrates that Respondent's removal of the children did not violate Petitioner's custody rights either under their legally binding Separation Agreement ratified by the Italian court, or under Italian law, and was therefore not wrongful.

Under the Hague Convention, custody rights include

"rights relating to the care of the person of the child" and "in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). Moreover, it is well-settled that "there are three possible sources of 'rights of custody:' judicial or administrative decisions, *legally binding agreements between the parties*, and operation of the law of the State." *Norden-Powers*, 125 F. Supp. 2d at 638 (emphasis added) (citing Hague Convention, art. 3). In furtherance of this inquiry, the court may take judicial notice of "the law of . . . the State of the habitual residence of the child, without recourse to specific procedures for proof of that law." Hague Convention, art. 14.

Under Italian law, "[p]arental authority is exercised by both parents" even after separation of the parents. It. C.c. § 155; *see also* It. C.c. § 316 ("The [parental] authority is exercised by both parents by mutual agreement.") Furthermore, the Italian Civil Code provides that the "decisions of major interest for the children on instruction, education and health are taken in agreement between the parents, keeping into account the capacities, the natural inclination and the aspirations of the children." It. C.c. § 155. In the case of a consensual separation agreement relating to the custody and maintenance of the children, the parties must obtain ratification from an

Italian court in order for the separation agreement to attain legal effect. *See* It. C.c. § 158.

Under this framework of Italian law, the parties' court-approved April 2011 Separation Agreement also sets forth Petitioner's and Respondent's respective custody rights. First, Paragraph B of the April 2011 Separation Agreement indicates that the children will live with Respondent and further requires Petitioner to move to a separate residence. (Resp. Exh. T, at 1-2.) Second, Paragraph C, echoing the language of the Italian Civil Code, indicates that "the minor children [E.G.P.] and [A.T.P.] are entrusted jointly to the custody of the parents and will live with their mother in the conjugal home." (Resp. Exh. T, at 2.) Paragraph C further sets forth the custodial arrangement between Respondent and Petitioner, setting forth the parties' rights of visitation and travel during different times in the year. (*Id.*) Paragraph C notes that Respondent "will also be able to spend one month in the company of the children in Italy or in any other place outside Italy . . . as long as it has previously been agreed on with the husband." (*Id.*) Finally, Paragraph O permits Respondent to return with the children to the United States upon satisfaction of certain conditions that, as explained above, actually came to pass here. (Resp. Exh. T, at 5.)

Significantly, Paragraph O serves as the parties'
court-ratified qualification of the custody rights set forth in
Paragraph C of the April 2011 Separation Agreement.[43]  In
particular, Paragraph O provides Respondent with the
authorization to return to New York so long as the conditions
set forth in the provision are met.  Thus, notwithstanding the
parties' custody rights over their children under the Italian
Civil Code and Petitioner's right to determine whether
Respondent could travel with the children under Paragraph C, the
parties agreed in Paragraph O that Respondent had the contingent
superseding right and authorization to remove the children to
the United States under certain future conditions.  By knowingly
and willingly signing the April 2011 Separation Agreement with
the assistance of his counsel, and obtaining judicial approval
of all of the terms of the Agreement, Petitioner bound himself
to allow Respondent to travel to and remain in New York with the
children at any time in the future so long as the conditions
precedent of Paragraph O were satisfied.  As such, Petitioner's
custody rights were not breached.

---

[43] Indeed, as explained above, to hold that Paragraph C affords
Petitioner the absolute right to prohibit Respondent from traveling outside
of Italy and returning to the United States with the children, even if the
conditions of Paragraph O came to pass, would render Paragraph O meaningless
and obsolete.  Such an interpretation is looked upon with disfavor under
Italian law, It. C.c. § 1367, and the court therefore rejects the contention
that Paragraph C affords Petitioner the unqualified right to prohibit
Respondent from traveling with the children without his permission.

To the extent that Italian law and Paragraph C afforded Petitioner custody rights with respect to determining if and when his children could travel to and remain in the United States, Paragraph O of the parties' April 2011 Separation Agreement qualified that custody right by permitting Respondent to return to the United States without Petitioner's agreement in a limited set of contingent future circumstances, all of which were fulfilled. It is well-settled that the Hague Convention envisages custody rights that arise from legally binding agreements between the parties or court orders, Hague Convention, art. 3, and the court finds that Paragraph O is one such right. Accordingly, in removing the children from Italy on April 24, 2012, Respondent was not violating Petitioner's custody rights. To the contrary, Respondent was exercising the parties' agreement as to her custody right to return to the United States pursuant to a consensual separation agreement approved by an Italian court. Petitioner's *post hoc* objection to Respondent's exercise of this right – one which he knowingly conferred upon her by entering into the separation agreement and which the Italian court approved – is wholly unavailing.

To establish that he had custody rights that were violated, Petitioner relies upon an assortment of out-of-circuit authority indicating that courts have taken an expansive view of

custody rights and also cites various Italian Civil Code
provisions. (Pet. Post-Trial Mem. at 10-11.)  For example,
Petitioner relies upon *Furnes v. Reeves*, 362 F.3d 702, 706-07
(11th Cir. 2004), wherein the Eleventh Circuit held that the
petitioner father had custody rights even though the parents'
custody agreement indicated that the daughter would live with
the respondent mother.  In so holding, the Eleventh Circuit
explained that "it is crucial to note that the violation of a
*single* right of custody suffices to make removal of a child
wrongful.  That is, a parent need not have 'custody' of the
child to be entitled to return of his child." *Id.* at 714-15.

        This court's determination is not inconsistent with
*Furnes*.  The parties in *Furnes* had no provision in their
agreement like Paragraph O, which here embodied the expression
of the parties' agreement to permit Respondent to remove the
children from Italy and relocate to the United States.  As
stated above, Paragraph O does not divest Petitioner of joint
custody or any of his custody rights; rather, the provision
grants Respondent the additional right to return with the
children to the United States without again seeking and
obtaining Petitioner's approval if particular events occur.
Unlike in *Furnes*, where the Eleventh Circuit found there to be a
violation of the petitioner's decision making authority over the

child's place of residence, Respondent did not interfere with
Petitioner's decision making authority here because Petitioner
granted Respondent authorization to make that decision
independently so long as Paragraph O's requirements were met.

Similarly, the Italian Civil Code provisions to which
Petitioner cites do not support a finding that Respondent's
removal of the children pursuant to her rights under Paragraph O
of the April 2011 Separation Agreement violated Petitioner's
custody rights.  Although Petitioner invokes Italian Civil Code
§§ 143, 144, 147, and 155, (Pet. Exh. 43, at 26-27), none of
these provisions invalidate, much less curtail, Respondent's
authorization under Paragraph O of the April 2011 Separation
Agreement to return to the United States with the children upon
satisfaction of the enumerated conditions precedent.  For
example, Italian Civil Code §§ 143, 144, and 147 set forth the
mutual obligations of husband and wife to support and contribute
to the family and set up the residence of the family in the same
house. (Pet. Exh. 43, at 26.)  Those Italian Civil Code
provisions, however, do not concern spouses who are separated
and do not preclude spouses who are separated from entering into
a binding and court-ratified separation agreement delineating
the rights and obligations of the respective parties.

Indeed, the only provision to which Petitioner cites

that is at all relevant to the context of marital separation is Italian Civil Code § 155, which provides that notwithstanding the consensual separation of spouses, the "[p]arental authority is exercised by both parties" and the "minor child has the right to maintain a balanced and stable relationship with each parent." It. C.c. § 155. As stated previously, Italian Civil Code § 155 clarifies that "[t]he decisions of major interest for the children on instruction, education and health are taken in agreement between the parents, keeping into account the capacities, the natural inclination and the aspirations of the children." *Id.*

Paragraph O and Respondent's actions thereunder do not violate Italian Civil Code § 155. Nothing in § 155 prohibits separated parents from entering into a consensual, binding, and court-approved separation agreement setting forth the specific conditions upon which one parent may exercise his or her unilateral right to relocate to another country with the children. Here, Paragraph O of the April 2011 Separation Agreement constitutes the parties' exercise of parental authority under § 155 and their agreement with respect to Respondent's court-ratified right to take the children to the United States and subsequently reside there provided that certain conditions precedent were satisfied. Moreover,

Petitioner has not presented any evidence that the children's'
"right to maintain a balanced and stable relationship with each
parent" under § 155 was violated by the April 2011 Separation
Agreement or Respondent's exercise of her rights thereunder.
Accordingly, Petitioner has failed to demonstrate that
Respondent's exercise of her authority to remove the children to
the United States pursuant to Paragraph O of the April 2011
Separation Agreement violated Petitioner's rights under any
provision of Italian law.

Furthermore, the Italian court ratified and so ordered
the April 2011 Separation Agreement only after "[c]onsidering
the opinion expressed by the public prosecutor's office . . .
after having verified that the conditions of the separation are
not contrary to the law, the public order and the public
morality." (Resp. Exh. T, at 8.)  As Petitioner's own Italian
law expert testified, Italian courts are unlikely to ratify a
separation agreement that violates Italian law. (Tr. 244:11-18.)
Paragraph O therefore comports with Italian domestic relations
law, and its express authorization of Respondent's conduct
demonstrates that there was no violation of Petitioner's custody
rights under Italian law in this case despite Petitioner's
protestations to the contrary.

Additionally, Petitioner contends that Respondent's

trip to New York on April 24, 2012 constituted a "vacation" requiring Petitioner's approval under Paragraph C, as opposed to a return to New York under Paragraph O. (Pet. Post-Trial Mem. at 11-12.) The gravamen of Petitioner's contention is that Respondent was not enforcing her rights under Paragraph O at the time that she departed from Italy because she viewed the trip as a vacation to New York to visit family. That is not so. Upon the fulfillment of the conditions of Paragraph O, which came to pass before Respondent departed from Italy, Respondent was authorized at all times thereafter to return to the United States with the children regardless of the reason for doing so. Even if Respondent intended to come back to Italy when she initially traveled to New York, this does not render her initial departure from Italy unauthorized by Paragraph O, nor does it require that the court view her departure under the terms of Paragraph C, thereby requiring her to obtain Petitioner's consent prior to departure.

Petitioner's argument is premised on the unfounded assumptions that any "return" to the United States would be a vacation and that a "vacation" could only be authorized by Paragraph C; this interpretation of the April 2011 Separation Agreement is plainly incorrect and ignores Paragraph O. To be sure, Respondent's trip to New York *was* authorized under

Paragraph C because she had obtained express prior consent from Petitioner prior to her departure,[44] but she did not need that express prior consent because the conditions of Paragraph O were met, thereby empowering her to leave Italy with the children as soon as those conditions were satisfied.  By the time Respondent left Italy, she had a freelance job with Polo and other fashion design companies but was unable to support herself and the children in Italy, both in light of Petitioner's failure to pay child and spousal support and rental payments throughout 2011 and the months preceding her departure.  Thus, Paragraph O permitted Respondent to remove the children and relocate to the United States.  The Petitioner's Italian law expert made clear that where, as here, an agreement sets forth conditions triggering a parent's right to remove the children and relocate to another country, the realization of those conditions alone is

---

[44] The court credits Respondent's testimony that she notified Petitioner of her plans to depart with the children on several occasions prior to April 24, 2012. (Tr. 294:16-25, 422:20-25, 451:11-14, 452:8-10.)  As Respondent testified, on the evening before Respondent traveled to the United States with the children, Petitioner saw his sons at the pool to say goodbye to them before their departure to the United States. (Tr. 414: 13-17.) Respondent's failure to remind Petitioner of her travel plans when he texted her to advise her of their son's April 24, 2012 appointment with the psychologist at Santo Stefano does not change the court's finding that Respondent received Petitioner's prior approval to travel with the children. Respondent sent a text message to Petitioner that she could not attend an appointment about which she had been previously unaware, without her Italian interpreter and admits that she was not focused on her trip when she texted Petitioner. (Pet. Exh. 48, at 2; Tr. 457:5-12, 459:10-20.)  Respondent's testimony is consistent with her other credible testimony that the Petitioner gave her permission to take the children to the United States a month to six weeks before her departure from Italy. (Tr. 294:16-25.)

sufficient to permit that parent to exercise that right. (*See* Tr. 242:12-244:10.)

In a final attempt to establish a violation of Petitioner's custody rights, Petitioner relies upon a letter from the Italian Central Authority ("Central Authority"), in which the Central Authority apparently determined that Respondent's removal of the children was wrongful under 574-*bis* of the Italian Penal Code. (Pet. Post-Trial Mem. at 12.) Petitioner argues that the views of the Italian Central Authority regarding the interpretation of its own law contained in that letter merit "some deference."[45] (*Id.* (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) (internal quotation marks omitted).) In its letter, the Central Authority advised that Respondent was under criminal investigation for child abduction under Italian Penal Code § 574-*bis* and that "in spite of the agreements signed within consensual separation proceedings – [Respondent's] sudden disappearance with her children without

_____

[45] The court notes that, as previously determined at trial, the Central Authority's letter, although admitted into evidence, does not constitute an Article 15 letter under the Hague Convention because neither the court nor the United States Department of State requested Petitioner to obtain this ruling from the Central Authority. (Tr. 261:2-9; Pet. Exh. 14, at 1.); *see* Hague Convention, art. 15. Moreover, even if the letter were an Article 15 determination, the court could take notice of, but is not bound by that determination. *See Norden-Powers*, 125 F. Supp. 2d at 635 n.1 (noting that the court "*may* under Article 15 take notice of . . . decisions" made by the Australian family court).

previously informing the father thereof is considered as a criminal offence in our legal system." (Pet. Exh. 14, at 1.) The court accords no weight to the cursory statement contained in the Central Authority's letter, particularly in light of the admitted lack of notice and opportunity for Respondent to offer facts that would have provided the Italian authorities with a more complete and balanced understanding of the circumstances.

In *Karaha*, the Second Circuit acknowledged that a foreign sovereign's views regarding its own laws merit some deference but "do not command" such deference. 313 F.3d at 92. Under *Karaha*, the court is not bound by the Central Authority's letter and finds its determination to be of limited value in this proceeding. First, although the court is unaware of the method by which Petitioner obtained this letter and of the process by which the Central Authority made its determination, Petitioner testified that he provided information to the Italian authorities, presumably based on his view of the facts, and the record indicates that Respondent was not provided notice or an opportunity to provide her response to Petitioner's criminal complaint. (*See* Tr. 107:5-19, 108:1-5.) The court will not afford determinative weight to statements in a letter procured in a process where Respondent had no notice or opportunity to be heard or present evidence in her favor. Second, the Central

Authority's letter, as admitted into evidence, makes no reference to the evidence that supports its determination and provides no detailed explanation of the Central Authority's reasoning.[46]  Third, the letter only indicates that a criminal *investigation* had been commenced against Respondent regarding certain charges under § 574-*bis*,[47] not that a legal proceeding had been commenced or that an Italian court found Respondent guilty of unstated criminal charges. (*See* Pet. Exh. 14, at 1.) Despite Petitioner's desire to characterize the Central Authority's letter as determinative, the court is troubled by the letter's lack of reasoned support and evidence for its conclusory determination.  As such, the court affords the letter no weight.

For these reasons, the court finds that Petitioner has failed to establish, by a preponderance of the evidence, that his custody rights were violated and that Respondent's removal

---

[46] Although the Central Authority's letter references an "attached notice dated 25 July 2012 from the competent Public Prosecutor," (Pet. Exh. 14, at 1), that notice was not submitted into evidence in this case, and the court declines to speculate upon the contents of that notice, other than to note Petitioner's testimony that he filed a complaint with the Italian police several days after he purportedly discovered that Respondent was not at the family home. (Tr. 108:1-5.)

[47] The Central Authority's letter does not provide the relevant language of Italian Penal Code § 574-*bis*.  Nor has Petitioner provided or quoted § 574-*bis* despite the opportunity to do so.  In any case, as explained previously, Respondent informed Petitioner of her plans to leave Italy with the children weeks before April 24, 2012, and Paragraph O of the April 2011 Separation Agreement provided Respondent with the court-approved authorization to return with the children to the United States.  As such, Respondent's exercise of that authorization does not constitute kidnapping or abduction.

of the children was wrongful within the meaning of the Hague

Convention.  As such, Petitioner has failed to establish his

*prima facie* case that Respondent's removal of the children on

April 24, 2012 was wrongful.

### C.   Petitioner's Consent to the Removal

Respondent contends that even assuming that Paragraph

O does not grant her authority under Italian law to remove the

children from Italy, Paragraph O confers Petitioner's consent to

the Respondent's relocation to the United States with the

children in certain circumstances. (Resp. Post-Trial Mem. at 15-

16.)  For substantially the same reasons articulated in the

court's analysis above regarding Petitioner's court-approved

authorization of Respondent's removal of the children from Italy

under certain conditions, the court agrees with Respondent and

concludes that Paragraph O constitutes Petitioner's pre-

committed consent to Respondent's departure from Italy

conditioned upon the satisfaction of Paragraph O's enumerated

conditions.

Respondent "may show by a preponderance of the

evidence that 'the person . . . having care of the . . . child .

. . consented to or subsequently acquiesced in the removal or

retention.'"  *A.A.M.*, 840 F. Supp. 2d at 632 (quoting Hague

Convention, art. 13(a)).  Despite the different outcome in

*A.A.M.*, Judge Weinstein's reasoning provides support for Respondent's contention that Petitioner consented to Respondent's return to the United States.  In *A.A.M.*, Judge Weinstein rejected the respondent father's consent defense on the grounds that the petitioner mother's purported consent was conditional upon circumstances that did not – and could not – come to pass. *Id.* at 638.  In that case, the parties informally agreed that petitioner gave her consent to the respondent's retention of the child in the United States, conditioned upon the petitioner's own ability to enter into the United States and join the family in New York. *Id.* at 638-39.  Because United States law prohibited and actually prevented the petitioner's illegal entry into the country, Judge Weinstein concluded that the condition precedent to trigger her consent became "impossible of effectuation" and therefore rendered the parties' agreement void. *Id.* at 638.

Judge Weinstein's reasoning is useful as a point of departure for the different result reached here.  Central to Judge Weinstein's conclusion that petitioner did not consent under the parties' agreement was the fact that the condition necessary to trigger that consent had not been fulfilled. *Id.* at 638.  That is not the case on this factual record.  As extensively set forth above, all of the conditions of Paragraph

O were met in this case as a result of Petitioner's chronic
nonpayment of rent and support payments, Respondent's inability
to support herself and the children in Italy, and Respondent's
possession of a job.  Thus, unlike in *A.A.M.*, where the
condition precedent to the agreement was impossible, the
conditions precedent to Paragraph O were possible and actually
effectuated. *Cf*. *Baxter v. Baxter*, 423 F.3d 363, 368-72 (3d Cir.
2005) (holding that the parties' agreement providing conditional
consent for respondent's removal did not authorize respondent to
retain the child beyond those conditions).  Here, Paragraph O
constituted Petitioner's *ex ante* consent to Respondent's return
to the United States, consent which is not rendered inoperable
by Petitioner's *ex post* regret that he permitted Respondent to
relocate his children to the United States under the terms of
the court-ordered April 2011 Separation Agreement.  Thus,
notwithstanding Petitioner's after-the-fact conduct
demonstrating his unhappiness and disagreement with Respondent's
return to New York with the children, Paragraph O set forth the
parameters that would trigger Petitioner's consent to
Respondent's removal of the children to the United States.  All
of those parameters were indisputably met.[48]

---

[48] Petitioner spends an inordinate amount of time arguing that
Respondent's claim is one of acquiescence because her claim is premised on
Petitioner's purported agreement after the removal of the children. (Pet.

Accordingly, in addition to Petitioner's failure to satisfy his *prima facie* burden to establish that the children were removed wrongfully in violation of his custody rights, Respondent has also established, by a preponderance of the evidence, that Petitioner both consented to Respondent's removal of the children when Respondent informed him of her plans prior to her departure in April 24, 2012, and also consented by agreeing to Paragraph O, pursuant to which the conditions precedent came to pass prior to her removal of the children from Italy.

## II.  Respondent's June 2012 Retention of the Children

Paragraph O also authorized Respondent to retain the children in the United States in late June 2012.  In many ways, the court's analysis with respect to Respondent's April 2012 removal of the children from Italy applies with equal, if not greater, force to Respondent's retention of the children in June 2012.  All of the conditions precedent necessary to trigger Respondent's retention rights under Paragraph O came to pass

---

Post-Trial Mem. at 14-17.)  Petitioner's arguments do not satisfy his burden to prove wrongful removal, are not fully responsive to Respondent's consent defense, and are unavailing. Although it is true that *ex ante* consent is distinct from *ex post* acquiescence, *see Gonzalez-Caballaro v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001) (citing *Friedrich*, 78 F.3d at 1060), Respondent has shown that Petitioner provided his conditional *ex ante* consent on the date that he entered into the April 2011 Separation Agreement.  In Respondent's view, Petitioner's consent to removal (and retention) of the children became active once the conditions of Paragraph O were met by Petitioner's own failures. (Resp. Post-Trial Mem. at 15-16.)  Upon review of the record, and for the reasons explained above, the court agrees.

prior to her June 2012 determination to retain the children in the United States.  Petitioner had already failed to pay months of rent and child and spousal support, and Respondent, who had a job of which Petitioner was fully aware, was unable to support herself and the children in Italy because of Petitioner's routine failure to satisfy his obligations under the April 2011 Separation Agreement.  Consequently, the court fully incorporates its previous discussion by reference and engages in the Hague Convention analysis below only to the extent necessary to demonstrate the propriety of Respondent's retention of the children in the United States.

### A.  Habitual Residence

To reiterate, Paragraph O embodies the Petitioner's authorization for Respondent to return to the United States with the children, and Petitioner thereby effectively permitted Respondent to change the habitual residence of the children form Italy to the United States in certain circumstances.  As set forth above, those circumstances came to fruition, vesting in Respondent the unambiguous right to depart from Italy and "return with the children to the United States." (*See* Resp. Exh. T, at 5.)  On June 24, 2012, Respondent sent Petitioner an e-mail indicating that she was "staying . . . in the United States" because of his "failure to support the children" and his

nonpayment of "9 months support and 18 months of . . . rent."

(Resp. Exh. U, at 1.) June 24, 2012, therefore, marks the date

upon which Respondent advised Petitioner of her decision to

retain the children in the United States as well as the date

upon which Respondent exercised her conferred right to change

the children's habitual residence from Italy to New York.

Under *Gitter*, this court must determine the children's

habitual residence at the time of the retention by inquiring

upon the latest shared intent of the parents. *See Gitter*, 396

F.3d at 134. Here, Paragraph O manifests Petitioner's intent to

permit Respondent to retain the children in New York and thereby

change the children's habitual residence from Italy to the

United States upon the fulfillment of Paragraph O's enumerated

conditions. The parties' latest shared intent is therefore

determined by Paragraph O; once Respondent exercised her rights

and the authority to which Petitioner consented under Paragraph

O to remain in the United States with the children, the

children's habitual residence consequently changed to the United

States. In reaching this conclusion, the court notes the unique

and limited nature of its holding: where, as here, a court-

ordered separation agreement sets forth the conditions upon

which a party may relocate a child to another country, and those

conditions are satisfied, the satisfaction of those conditions

authorizes that party to change the child's habitual residence
to the new country.

This conclusion is not unprecedented. Other courts
within this Circuit have determined that a separation agreement
plays a significant role in determining the habitual residence
of a child. *See Guzzo v. Cristofano*, No. 11-CV-7394, 2011 WL
6934108, at *9 (S.D.N.Y. Dec. 30, 2011) ("[T]he Court finds that
the Separation Agreement, pursuant to which the parties agreed
that Respondent would have custody of the child, live with the
child in New York, and send the child to school in New York,
constitutes the last shared intent of the parties."). In *Guzzo*,
the court held that the child's habitual residence changed to
the United States because "[f]irst, and *most significantly*, the
parties documented their shared intention in a Separation
Agreement, which expressly contemplated that the child would
live and attend school in New York with Respondent." *Id.*
(emphasis added). Although the district court in *Guzzo*
enumerated other factors supporting its determination that the
parties shared the intent to change the child's habitual
residence to the United States, the district court acknowledged
the prime importance of the parties' separation agreement in
evincing their shared intent in determining the child's habitual
residence. *Id.* As in *Guzzo*, the parties here entered into a

consensual separation agreement manifesting their shared intent,
with court approval, to permit Respondent to change the
children's habitual residence to the United States.  Although
the separation agreement in *Guzzo* was not contingent upon the
satisfaction of conditions precedent, that distinction does not
alter the court's finding here that the satisfaction of
Paragraph O's conditions activated Respondent's nascent right to
change the children's habitual residence and that she did so in
late June 2012.[49]

Accordingly, because Paragraph O authorized Respondent
to change the children's habitual residence so long as the
preconditions were satisfied, the court finds that Petitioner
has failed to discharge his burden to prove his *prima facie* case
under the Hague Convention by a preponderance of the evidence.

---

[49] *Gitter* also requires that the court inquire upon whether the
children have acclimatized to a "new location and therefore ha[ve] acquired a
new habitual residence notwithstanding any conflict with the parents' latest
shared intent." 396 F.3d at 134.  In *Gitter*, however, the Second Circuit
cautioned that "courts should be 'slow to infer' that the child's
acclimatization trumps the parents' shared intent" and instructed that
"[n]ormally the shared intent of the parents should control the habitual
residence of the child." *Id.* (emphasis added).  Upon review of the record,
the court finds that the acclimatization of the children to Italy does not
trump the parties' express shared intent to permit Respondent to change the
children's habitual residence to the United States, especially in light of
the young age of the children, their enrollment in New York schools, the
medical care being provided for A.T.P.'s medical condition in New York, and
the growing closeness of the children with their American family, whom they
have visited yearly for Christmas since their birth.  Accordingly, the court
determines that, at the time of their retention in the United States in June
2012, the children's habitual residence was the United States based upon the
shared intent of the parties, embodied in the April 2011 Separation
Agreement, whereby Petitioner authorized Respondent to fix the children's
habitual residence in the United States.

There was no wrongful retention of the children in the United States because the United States was their habitual residence at the time of their retention in June 2012.

**B.    Respondent's Violation of Petitioner's Exercised Custody Rights**

Even if Paragraph O did not authorize Respondent to change the children's habitual residence to the United States, the court finds that Paragraph O provided Respondent with the Petitioner's authorization to remain in the United States. Respondent's retention of the children therefore could not and did not violate Petitioner's custody rights under Italian law. In the same way that Paragraph O gives rise to Respondent's right to remove the children from the Italy, Paragraph O implements the Petitioner's authorization that his custody rights were contingent on, and qualified by, Respondent's right to retain the children in the United States upon the satisfaction of Paragraph O's requirements.

Indeed, Paragraph O permits Respondent "to return with the children to the United States provided that she has found a job of her own" if Petitioner either failed to pay rent or failed to pay requisite spousal and child support such that Respondent was unable to support herself and the children in Italy. (Resp. Exh. T, at 5.)  Based upon the preponderant record

evidence, the applicable provisions of Italian law, and the neighboring provisions contained in the April 2011 Separation Agreement, the court finds that Paragraph O authorizes Respondent to remain in the United States with the children under certain conditions. Moreover, the record demonstrates that those conditions were met at the point that Respondent decided to retain the children in the United States.

It is of no moment that the language of Paragraph O authorizes Respondent to "return" as opposed to "remain in" or "retain the children in" the United States. As the court has already explained, the word "return" is appropriately interpreted to include both the removal and retention of the children. Petitioner's assertions to the contrary are unsupported by any authority and incongruous with the rest of Paragraph O, which, unlike Paragraph C, contemplates a permanent relocation to the United States and not a temporary visit. (*Compare* Resp. Exh. T, at 2, *with* Resp. Exh. T, at 5.) Indeed, Petitioner's interpretation of the word "return" renders Paragraph O essentially meaningless.

Accordingly, because Paragraph O affords Respondent the right to return with the children to New York, her subsequent retention of the children on or around June 24, 2012 did not breach any custody rights exercised by Petitioner under

Italian law.  Petitioner's *prima facie* case as to Respondent's
purported wrongful retention therefore fails.

  **C.** **Petitioner's Consent**

   The court also incorporates by reference its analysis
regarding Respondent's affirmative defense that Petitioner
consented to her removal of the children and, likewise,
determines that Paragraph O embodies Petitioner's consent to
Respondent's retention of the children in the United States in
June 2012.  The record along with credible testimony at trial
support the court's determination that Petitioner, through
Paragraph O, conferred his *ex ante* consent to Respondent's
permanent relocation with the children in New York under certain
conditions that were satisfied here.  His after-the-fact change
of heart and regret that he provided this explicit and binding
consent through the April 2011 Separation Agreement does not
alter the court's analysis.  At the time that Respondent
exercised her right to retain the children in the United States,
the conditions precedent to Paragraph O permitting her to do so
had been satisfied.  The court therefore concludes that
Respondent has demonstrated Petitioner's consent to her
retention of the children by a preponderance of the evidence.

## CONCLUSION

This is a sad case, one leaving the court in the difficult position of determining the future of two young children whose parents both sincerely and deeply love and care for them. Accordingly, the court has repeatedly encouraged Respondent and Petitioner to settle their differences and reach a mutually agreeable outcome that prioritizes the best interests of their children. The court is hopeful that those interests guide the parties in any future legal proceedings and that the parties seriously consider resolving this matter amicably.

Not yet having done so, however, the parties have left the court with the weighty task of determining the wrongfulness of Respondent's removal of the children from Italy and their subsequent retention in the United States under the Hague Convention and ICARA. Upon careful consideration of the record, the court determines that Paragraph O of the April 2011 Separation Agreement – the conditions of which were fully satisfied by Petitioner's routine failure to fulfill his support and rent obligations, by Respondent's job as the owner of her own company and a freelance worker for design companies (and Petitioner's knowledge thereof), and by Respondent's inability to support herself and the children because of Petitioner's habitual failure to comply with his court-ordered support

obligations – authorized Respondent to return and remain in the United States with the children.  Accordingly, Petitioner's request for relief under the Hague Convention is denied, the petition is dismissed, and each party shall bear its own costs. The court's prohibition on Respondent's removal of the children from New York during the pendency of this action is hereby lifted.  The Clerk of the Court is respectfully requested to return the children's passports to Respondent, close this case, and enter judgment in favor of Respondent.

        **SO ORDERED.**

Dated:     November 25, 2012
            Brooklyn, New York

                                /s/
                          KIYO A. MATSUMOTO
                          United States District Judge
                          Eastern District of New York